**In re PROFESSIONAL HOCKEY
ANTITRUST LITIGATION
(MULTIDISTRICT LITIGATION).**

Civ. A. Nos. 72–1661, 72–1807, 72–1902, 72–
1906, 72–1995, 73–19, 73–74, 73–215, 73–
218, 73–358, 73–2484, 74–127 and 74–161
to 74–163.  M.D.L. No. 119.

United States District Court,
E. D. Pennsylvania.

Feb. 26, 1974.

Leonard W. Wagman and Michael C. Silberberg of Golenbock & Barell, New York City, Perry S. Bechtle, Alan M. Lerner, Barry F. Greenberg of Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Metropolitan Hockey Club, Inc. and Golden Blades Hockey, Inc.

Harold E. Kohn, Allen D. Black, David H. Weinstein, Arthur B. Makadon, of Harold E. Kohn, P.A., Philadelphia, Pa., for Harold E. Kohn, Harold E. Kohn, P.A., and World Hockey Assn.

HIGGINBOTHAM, District Judge.

## OPINION

### I.

### INTRODUCTION

This opinion constitutes the most recent chapter to an increasing number of directives and rulings issued by the Court—some *sua sponte*—over the past couple of weeks. These declarations heretofore were not prescribed to indulge any whims of the Court but unfortunately were necessitated by the numerous motions filed with the Court on a regular basis by the remaining parties to this antitrust litigation.

The instant matter pertains to the motion of Metropolitan Hockey Club, Inc. ("Metropolitan") and Golden Blades Hockey, Inc. ("Golden Blades") of the World Hockey Association ("WHA") to compel Harold E. Kohn, Esquire, and his firm, Harold E. Kohn, P.A., to produce for inspection and copying by Metropolitan and Golden Blades all legal papers and documents served by or upon Kohn and his firm prior to the settlement of portions of this litigation. Exclusive of

Metropolitan and Golden Blades, the other member clubs of the WHA have executed a Consent Decree with the member clubs of the National Hockey League ("NHL"), said Consent Decree being approved by the Court on February 19, 1974.

Incident to the resolution of the aforementioned motion is the determination of the validity of an attorney's lien asserted by Kohn and his firm on all the papers falling within that category and now in their possession. Metropolitan and Golden Blades contend, *inter alia*, that Kohn had been retained by WHA as lead counsel to prosecute this litigation and consequently the status of Metropolitan and Golden Blades as members of WHA entitles them to copies of all legal documents in Kohn's possession. Consistent with that position, Metropolitan and Golden Blades insist that they are not required to pay Kohn any monies for inspection and receipt of said materials, except the nominal costs for reproduction and duplication.

For reasons which are hereinafter set forth, the Court concludes that Harold E. Kohn and his firm do have a legitimate general or retaining attorney's lien which attaches to all papers relating to and arising out of this litigation and now under their control. *Before* such documents are to be released, Metropolitan and Golden Blades must satisfy the full amount of the lien established by the Court as due and owing to Kohn or otherwise post adequate security to ensure adequate surety indemnification in the event of their subsequent noncompliance.

### II.

### FINDINGS OF FACT

On the basis of the facts which are not in dispute, taking into consideration the WHA Requests for Admissions and the answers thereto, the memoranda of Golden Blades and Metropolitan in support of their motion, documents filed in opposition to said motion, and the various responses submitted in compliance

with Pretrial Orders Nos. 14, 15 and 17, the Court makes the following findings of fact:

### A. METROPOLITAN HOCKEY CLUB, INC.

1. In the early part of 1972, Metropolitan acquired a franchise to operate a team of the new WHA within 100 miles of New York City Hall.

2. Metropolitan was one of the original twelve clubs assigned franchises in the newly created WHA.

3. After paying only two player payrolls in the fall of 1972, Metropolitan failed to pay its financial obligations, including players' payroll.

4. The WHA then stepped in and paid that payroll and the other expenses of the team until some time prior to May 11, 1973.

5. An agreement between Metropolitan and WHA was entered into on November 16, 1972, wherein Metropolitan agreed to pass a corporate resolution empowering the WHA's designee to be named operating manager of Metropolitan.

6. (a) Metropolitan and WHA intended jointly to seek a new owner for the team.

(b) Under the agreement between WHA and Metropolitan dated November 16, 1972, it was agreed that any and all sums to continue day-to-day operations of Metropolitan were to be reimbursed out of the proceeds of the sale of the assets and franchise of Metropolitan.

7. Messrs. Ralf Brent, Lawrence Stern and Lee Matison were willing to acquire a WHA franchise in the New York metropolitan area.

8. Messrs. Brent, Stern and Matison entered into an agreement with the WHA dated April 11, 1973 and Raiders Hockey, Inc., now Golden Blades, entered into an agreement with Metropolitan dated March 26, 1973 in respect of the acquisition of the assets and certain liabilities of Metropolitan.

9. The unpaid Metropolitan obligations included about $270,000 in unpaid withholding taxes.

10. The purchase price recited in the agreement of April 11, 1973 between Messrs. Brent, Stern and Matison and WHA is $1,500,000. In addition, Raiders Hockey, Inc. was required by WHA to acquire all of the assets of Metropolitan, which acquisition was consummated at a purchase price of 200,000 shares of Golden Blades Common Stock.

### B. GOLDEN BLADES HOCKEY, INC.

11. By agreement dated March 26, 1973, Raiders Hockey, Inc., now Golden Blades, acquired all of the assets and certain liabilities of Metropolitan.

12. On May 11, 1973, Messrs. Brent, Stern and Matison fulfilled all of the terms of their agreement of April 11, 1973 with WHA except that they requested additional time to arrange for the issuance of a $500,000 promissory note. WHA agreed to this request and on May 14, 1973, the sum of $500,000 was paid WHA in cash in lieu of the issuance of said promissory note.

13. Raiders Hockey, Inc., a Delaware corporation, had been formed prior to the closing with WHA. Subsequently, that corporation's name was changed to Golden Blades Hockey, Inc. Messrs. Brent, Stern and Matison assigned all of their rights under the WHA agreement to Golden Blades and a franchise was subsequently issued by the WHA to Golden Blades.

14. Metropolitan owns 200,000 of the 1,040,000 outstanding shares of Golden Blades Common Stock.

15. On November 8, 1972, this Court in Phila. World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462 (E. D.Pa.1972) granted a preliminary in-

junction to the WHA effective upon posting a $2.5 million bond.

16. The WHA Litigation Report of October 11, 1973, states in part:

### "PRELIMINARY INJUNCTION BOND

"The last, and perhaps most important part of this report, concerns the preliminary injunction bond posted in the Philadelphia action. As you will know, that bond is in the amount of $2,500,000. At present it is supported by nine (9) letters of credit, each for $250,000, delivered by each of the following nine (9) WHA Members:

"1. Chicago Cougars Hockey Club, Inc.

"2. Edmonton World Hockey Enterprises Ltd.

"3. Professional Hockey Corp. (Los Angeles)

"4. Midwest Saints, Inc. (Minnesota)

"5. New England Professional Hockey, Inc.

"6. Le Club De Hockey Les Nordiques, Inc.

"7. Sports Centrepoint Enterprises, Ltd. (Winnipeg)

"8. Ontario Nationals Hockey Teams, Inc. (Ottawa)

"9. Philadelphia World Hockey Club, Inc. (Blazers)

"Obviously, two of the entities posting bonds (Philadelphia and Ottawa), will no longer desire to participate. Although they are parties to the litigation and, in the best interests of all, have decided not to withdraw, it is appropriate that their letters of credit not be renewed, and new letters be posted by Vancouver and Toronto. It would also seem appropriate that the new WHA Member Franchises become parties in this litigation, as their interests are just as much at stake as those already involved as parties.

"During the first week of November, many of these letters of credit begin to expire and the bonding company has recently written us demanding that the *full* amount of collateral ($2,500,000) be posted with them, in the form of letters of credit no later than November 1, 1973. The form of letter of credit requested by the bonding company is that recently issued by the Los Angeles Sharks, a copy of which is enclosed for your reference.

"Twelve WHA clubs are now playing hockey and each of them is receiving the daily benefit of the existence of the preliminary injunction. Consequently, it appears that the appropriate method of supporting the new bond which will be issued in early November would be to divide twelve into $2,500,000 and have each club post a letter of credit for approximately $210,000. Obviously, this will require some readjustment. In addition, the bonding company will not accommodate us at all this year and, it is an absolute requirement that the collateral be posted on time, or the bond will be revoked. I am sure that all counsel will agree with me and the WHA Legal Committee that this would be a disastrous result, causing us to lose all credibility in the pending Philadelphia actions."

17. The Court makes no finding as to whether Golden Blades as a condition precedent to participation in this antitrust litigation was required to submit a letter of credit in the amount of $250,000 or $210,000.

18. Paragraph 4.4 of the April 11, 1973 Agreement provides:

"In the event that the Members [Messrs. Brent, Stern and Matison] fail to pay the Purchase Price at the Closing [May 11, 1973] or to make other arrangements satisfactory to WHA in respect thereof, this Agreement shall terminate, in which event the Advance [$100,000] shall be retained by WHA as liquidated damages and the rights of the parties hereto shall be governed by the provisions of Paragraph 10 below."

19. Golden Blades never paid the $270,000 for Metropolitan's withholding taxes which it assumed pursuant to Paragraph 4.2.3(iii) of the April 11, 1973 Agreement.

20. Paragraph 6 of the Agreement of April 11, 1973 states:

"The Purchase Price payable hereunder is inclusive of all obligations in respect of assessments, expenses, penalties, and the like, payable by WHA members prior to date hereof, it being the intent hereof that the Franchise hereby granted to the Members is free and clear of all such obligations to WHA. With respect to future assessments against WHA members from and after the date hereof, the Members will be obligated therefor with the exception of any assessments so made in respect of obligations incurred by WHA in its operation of the Raiders from and after November 15, 1972."

21. Paragraphs 10 through 10.3 of the April 11, 1973 Agreement provide:

"10. In the event that the Closing does not occur because of default by the Members under any of the provisions hereof or pursuant to such other arrangements as shall be made by the parties hereto.

"10.1 the Franchise and Interest in Properties shall be delivered by the Escrow Agents to WHA;

"10.2 all funds being held in the Trust Account shall be delivered to WHA; and

"10.3 all contracts, including but not limited to players contracts, entered into by the Members on behalf of the Raiders shall be assigned to WHA.

22. Paragraph 11 of the April 11, 1973 Agreement stipulates:

"The payment assumed by the Members pursuant to Paragraph 4.2.3 and Exhibit E of this Agreement shall be deemed to be assessments of the WHA pursuant to the WHA By-Laws and a default in payment thereof shall be deemed a default in payment of a WHA assessment."

23. Golden Blades and Metropolitan were advised that gate receipts were a principal source for financing general operations of WHA administration, including the antitrust litigation, and that prior to the acquisition by Golden Blades of its franchise, the WHA had levied substantial special assessments upon the WHA member teams as the principal source of financing and antitrust litigation.

24. (a) During the 1973–74 season, the WHA gate assessment is a minimum of $62,500 per team per season or 6%, whichever is greater.

(b) This assessment is paid at the rate of $1600 per game with an adjustment at the end of the season.

25. At no time has either Metropolitan or Golden Blades ever paid a gate receipt assessment to the WHA.

26. When the 1973–74 season commenced in the Fall, Golden Blades sold between $340,000 and $400,000 in season tickets but receipts from such sales were on a delayed billing basis and some have never been collected.

27. After October 18, 1973, WHA announced that it was paying the players of Golden Blades.

28. The WHA has advised Golden Blades that as of mid-November 1973, it paid an excess of $275,000 of league funds to creditors of Golden Blades.

29. (a) The Chemical Bank is a creditor of the Golden Blades and its principals.

(b) WHA has advised the Golden Blades that Chemical Bank has asserted a claim of $440,000 plus interest against WHA.

30. Golden Blades has been advised that certain season ticket holders are making claims against WHA in an amount exceeding $340,000.

## III.

## DISCUSSION

Harold E. Kohn, Esquire, and his firm, Harold E. Kohn, P.A., now assert the existence of a general or retaining

attorney's lien on all the legal papers and documents in their possession which pertain to or affect the instant antitrust litigation. The recognition of the availability of such a lien is not a phenomenon of recent vintage since this form of security device had its origin at common law and the Courts traditionally have soundly exercised their equitable powers in order to effectuate the underlying considerations of balancing and protecting the interests of both the attorney and his client.

As early as 1871 the United States Supreme Court acknowledged the unique status of the attorney's lien as a means of fully satisfying the financial obligations owed to an attorney by a client due to services rendered which inured to the benefit of the client. To secure payment of fees incurred and other related disbursements, the attorney could retain all papers belonging to the client. In re Paschal, 77 U.S. (10 Wall.) 483, 493–497, 19 L.Ed. 992, 996–997 (1871). This concept was reaffirmed in principle in McPherson v. Cox, 96 U.S. 404, 417–418, 24 L.Ed. 746, 750–751 (1878).

In Smyth v. Fidelity & Deposit Co. of Maryland, 125 Pa.Super. 597, 190 A. 398, aff'd. per curiam 326 Pa. 391, 192 A. 640 (1937), a Pennsylvania court articulated some of the guidelines regarding the general or retaining attorney's lien as distinguished from the charging lien. The Court there stated:

" 'The retaining lien may be defined as the right of an attorney at law to retain possession of such documents, money, or other property of his client coming into his hands by virtue of the professional relationship, until he has been paid for his services, or until he voluntarily surrenders possession of the property, with or without payment.' " 190 A. at 401.

In further clarifying the character of the lien, the Court noted:

" '[The retaining lien] is a mere right of the attorney to retain the papers, etc., of his client in his possession until his claim is satisfied; it confers no

further rights, and is valuable to the attorney in proportion to the extent that such retention by him will embarrass the client, that is to say, he cannot sell said papers, under process to foreclose his 'lien, as may a pledgee or a mortgagee in other cases, but his lien extends only to the right to retain such papers until his debt is paid. * * *' " 190 A. at 401.

Generally, other jurisdictions have been in accord with the foregoing teachings. See, e.g., Lyman v. Campbell, 87 U.S.App.D.C. 44, 182 F.2d 700, 701–702 (1950); In re San Juan Gold, Inc., 96 F.2d 60 (2d Cir. 1938); The Flush, 277 F. 25 (2d Cir. 1921), cert. denied, 257 U.S. 657, 42 S.Ct. 184, 66 L.Ed. 421 (1921); Borup v. National Airlines, 159 F.Supp. 808, 810 (S.D.N.Y.1958); Steiner v. Stein, 141 N.J.Eq. 478, 58 A.2d 102 (1948); Norrell v. Chasan, 125 N.J. Eq. 230, 4 A.2d. 88 (1939). Cf. Jaslow v. United States, 308 F.Supp. 1164, 1165–1166 (E.D.N.Y.1970) and Schwartz v. Broadcast Music, 130 F.Supp. 956, 958–959 (S.D.N.Y.1955). In a related context the ABA Code of Professional Responsibility, Ethical Consideration 5–7 and Disciplinary Rule 5–103(A)(1) promulgated thereunder expressly allow for such a lien. The latter rule notes that an attorney may "[a]cquire a lien granted by law to secure his fee or expenses." Cf. Disciplinary Rule 9–102(B)(4).

The dispute between Harold Kohn and Metropolitan and Golden Blades acquires an additional dimension because of the controverted relationship as to whom Kohn represents. On the one hand, Metropolitan and Golden Blades argue that Kohn, as lead counsel for the WHA since January 1973, represents Metropolitan and Golden Blades since they are member clubs of the WHA. On the other hand the principal officers and stockholders of Metropolitan and Golden Blades, Messrs. Richard I. Wood and Seymour E. Siegel, testified at their depositions that they had never retained Harold E. Kohn, P.A., on behalf of Metropolitan and Golden Blades to prosecute

their claims in this litigation but instead had earlier retained the law firm of Paul, Weiss, Goldberg, Rifkind, Wharton and Garrison prior to switching to their current counsel. Depositions of Richard I. Wood and Seymour E. Siegel, February 16, 1974 at 30, 34–40, 82–83.

Metropolitan and Golden Blades beseech the Court to do what is equitable yet these two parties flatly refuse to acknowledge any obligations on their parts in return. The findings of fact previously recited clearly indicate that neither Metropolitan nor Golden Blades has financially borne its portions of the costly litigation expenses incurred by Harold Kohn and WHA to date. The WHA was required to assume the financial liabilities of Metropolitan as early as November 1972. Metropolitan did not pay its percentage of the gate assessments, its pro-rata share of the counsel fees or post its letter of credit in the amount of $250,000 to secure the $2.5 million preliminary injunction bond ordered by this Court on November 8, 1972.

█ Counsel for Golden Blades places considerable emphasis on paragraph 6 of the April 11, 1973 Agreement in that this section purportedly absolves Golden Blades from any additional assessments by WHA or other liabilities of Metropolitan which were outstanding prior to April 11, 1973. Yet even the terms of the April 11th Agreement, which Golden Blades counsel contends relieve it of further financial demands as to past Metropolitan debts, have not been performed. Paragraph 6 of the April 11th Agreement in any event does not operate as a bar against Golden Blades being subject to additional assessments by WHA after April 11, 1973. In fact, that paragraph expressly recognizes this contingency:

" . . . With respect to future assessments against WHA members from and after the date hereof [April 11, 1973], the Members will be obligated therefor with the exception of any assessments so made in respect of obligations incurred by WHA in its

operation of the Raiders from and after November 15, 1972."

A number of the affidavits and other memoranda tendered to the Court in behalf of Kohn and WHA suggest that in addition to the conditions spelled out in the April 11th Agreement Golden Blades was required to post a letter of credit in the amount of $210,000 to secure the preliminary injunction bond in this case. Since this assertion was vigorously denied by Golden Blades, I specifically make no finding as to whether as a condition precedent to the Golden Blades' participating in this litigation or being a beneficiary in any way it was required to post said letter of credit.

██ Kohn and the WHA are entitled to be compensated for the reasonable value of the services rendered by them until the date of the approval of the Consent Decree in this action, February 19, 1974. On a *quantum meruit* basis, Metropolitan and Golden Blades should be compelled to reimburse Kohn and WHA for their labors. Massive numbers of documents have been accumulated by the parties over the course of this complex antitrust litigation at considerable expense to WHA and Kohn. Depositions, for instance, were taken not only throughout the United States but in several cities in Canada as well.

Courts from time to time are invoked to determine the extent of an award of reasonable counsel fees on a *quantum meruit* basis. See, *e.g.,* Tranberg v. Tranberg, 456 F.2d 173, 175 (3rd Cir. 1972); Borup v. National Airlines, 159 F.Supp. 808, 810 (S.D.N.Y.1958). While it is true that the case at bar is not a class action, it does involve multiple parties and therefore the recent opinion of the Third Circuit in Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. Sanitary Corp., 487 F.2d 161 (3rd Cir. 1973), could immeasurably illuminate this subject.

In *Lindy Bros.,* 487 F.2d at 165, Chief Judge Seitz commented:

"The award of fees under the equitable fund doctrine is analogous to an

action in quantum meruit: the individual seeking compensation has, by his actions benefited another and seeks payment for the value of the service performed. Understood in this way, there are two possible 'causes of action' that may be urged as the basis for award of attorneys' fees. One of these 'causes' belongs to the plaintiff who brought the underlying suit. His claim is that by instituting the suit he has performed a service benefiting other class members. The reasonable value of that service is measured by the expenses incurred by the plaintiffs on behalf of the class."

\*   \*   \*   \*   \*   \*

"The second 'cause of action' for award of attorneys' fees under the equitable fund doctrine belongs to the attorney. The attorney's claim is that his conduct of the suit conferred a benefit on all the class members, that one or more class members has agreed by contract to pay for the benefit the attorney conferred upon him, and that the remaining class members should pay what the court determines to be the reasonable value of the services benefiting them."

■ The Court elaborated on the criteria lower court judges should apply in arriving at the amount of the attorneys' fees in cases of this type. The Court advised that one should consider (1) the number of hours spent by the attorneys in prosecution of the case and in what manner which attorneys spent those hours; (2) the value of the services to the parties measured in part by the Court's own assessment, the normal hourly billing rate, and the attorney's legal reputation and status; (3) the contingent nature of the litigation; (4) "the complexity and novelty of the issues presented, the quality of the work that the judge has been able to observe, and the amount of recovery obtained." *Id.* at 168.

I recognize that Kohn and the other members of the WHA exclusive of Metropolitan and Golden Blades have already settled their litigation with the NHL. For the time period of January, 1973 to December 31, 1973, Kohn, as lead counsel for WHA, asserts that the WHA has incurred legal expenses of $988,776.00. By letters dated February 25, 1974 to the Court, Kohn's firm has advised the Court that from April 1, 1973 to December 31, 1974 Harold E. Kohn, P.A., and WHA have costs amounting to $580,164.59 plus an additional $22,655.41 for disbursements and legal services rendered by Harold E. Kohn, P.A., in January, 1974.

■ As I view the applicable law, in order to receive the papers sought, Metropolitan and Golden Blades could be obligated to pay the total legal fees and related costs expended by the WHA in pursuing this antitrust litigation from its initiation to the hour of settlement. These figures, as previously noted, could approximate one million dollars. However, since the general attorney's lien is partially addressed to the Court's equitable powers, I would grant Golden Blades and Metropolitan the rights to have all of the papers in question immediately if they pay one-twelfth\* of all counsel fees and related costs pertaining to this antitrust litigation from April 11, 1973 to the date of the Consent Decree, February 19, 1974. On the basis of the documentation filed to date the lien would be one-twelfth of approximately $602,820.-00.

■ In making this ruling I am *not* holding that Harold E. Kohn, P.A., and WHA are not ultimately entitled to more than the one-twelfth sum, *supra*. In fact, I hold the contrary; ultimately WHA and Harold E. Kohn, P.A., may be entitled to the entire sum approximating one million dollars. Furthermore, if Golden Blades and Metropolitan receive any verdict from the defendants, before payment of the verdict to Metro-

---

\* When the litigation was commenced in August, 1972 there were twelve clubs in the WHA. For the lien purposes I have concluded that the equitable obligation of Met-ropolitan and Golden Blades should be one-twelfth, treating Metropolitan and Golden Blades as a single entity.

politan, Golden Blades, or their present counsel, the issue of the lien and the amount which is owed to WHA and Kohn's firm for their past legal services will be reopened and adjudicated.

While there has been some documentation as to attorneys' fees, I will give to Metropolitan and Golden Blades the opportunity to conduct an evidentiary hearing this week in order that WHA and Kohn can provide with specificity the precise breakdown of the one million dollar figure which they claim they have paid or become obligated to pay. I am mindful of Chief Judge Seitz' perceptive comments in *Lindy Bros., supra,* and intend to adhere strictly to them.

Though this opinion is filed prior to having the total figures of WHA's counsel fees fully documented, the opinion is written so that Golden Blades and Metropolitan can ascertain the rationale of the Court's thinking on this lien issue. If they desire to pursue the evidentiary hearing they may, with a full recognition of the formula which will be applied as a condition precedent to the release of the papers sought. This opinion is further filed so that if Golden Blades and Metropolitan are not financially prepared to satisfy the lien or post the surety indemnification bond required, they will be able to file their proposed schedule for finishing discovery and filing a final pretrial order and other pretrial memoranda.

Finally, I am aware that in the cases of Jaslow v. United States, *supra,* 308 F.Supp. at 1165, and Schwartz v. Broadcast Music, *supra,* 130 F.Supp. at 958, the Courts there adopted a slightly different approach with regard to resolution of the lien issue. In *Schwartz,* the Court reserved determining the amount of the attorney's lien or requiring payment thereof until the conclusion of the trial since a portion of the attorney's claimed compensation was contingent upon the amount of the recovery, a figure which could not be accurately ascertained before the end of the litigation. In *Jaslow, supra,* the Court, which was also dealing with a contingent fee arrangement, noted that the attorney's lien could be satisfied out of any subsequent recovery and reserved against that recovery rather than requiring an immediate cash payment by the client once the attorney's services had been discharged. Significantly, the amount of the attorney's lien in question was only $1,950.00.

In view of the precarious financial position of Metropolitan and Golden Blades and the non-contingent character of the controversy herein raised, the Court will not defer deciding the entire lien question until the termination of litigation which will be lengthy and extremely costly to the parties remaining. This procedure comports with that approach utilized by the Second Circuit in In re San Juan Gold, Inc., *supra,* 96 F.2d at 60–61, where it held:

". . . As explained in The Flush, supra, the right to retain the papers is valuable to the attorney in proportion as denial of access to them causes inconvenience to the client. *Where the client or some one representing him has a pressing necessity for them, the court will order them delivered up upon condition that the fee be paid or security given for such sum as may be found to be due.* In the case at bar the trustee argues that the debtor has insufficient funds either to pay or to provide security for the appellant's fee. The record contains no evidence that the debtor is without funds, *but however this may be, the fact is immaterial. Nor is it material that the debtor's reorganization proceedings may be thwarted,* if access to the papers is denied. The attorney's lien cannot be disregarded merely because the pressure it is supposed to exert becomes effective. Cf. Davis v. Davis, 90 F. 791, C.C.Mass. If it is worth anyone's while to have the 77B proceedings continue and the papers are essential to that end, *the necessary funds to obtain their release may be forthcoming; if not, the debtor and its trustee must do without them* (Emphasis added).

Thus, for all the foregoing reasons Harold E. Kohn and Harold E. Kohn, P. A., will not be compelled to release any legal papers until the attorney's lien in the amount previously stated has been satisfied or adequate surety indemnification is otherwise provided.

