**In re PROFESSIONAL HOCKEY ANTITRUST LITIGATION.**

M. D. L. No. 119.

Civ. A. Nos. 72–1995, 73–19 and
74–161 to 74–163.

United States District Court,
E. D. Pennsylvania.

July 3, 1974.

See also, D.C., 371 F.Supp. 742.

Perry S. Bechtle, Alan M. Lerner, Barry F. Greenberg of Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., and Leonard W. Wagman and Michael C. Silberberg of Golenbock & Barell, New York City, for plaintiffs, Metropolitan Hockey Club, Inc. and Golden Blades Hockey, Inc.

Edwin P. Rome and Richard P. McElroy of Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for all defendants except Atlanta Hockey, Inc. and Nassau Sports.

Harry L. Shniderman, Herbert Dym and Bingham B. Leverich of Covington & Burling, Washington, D. C., for defendant National Hockey League.

Edward Bennett Williams, Harold Ungar, Steven M. Umin and Richard M. Cooper of Williams, Connolly & Califano, Washington, D. C., for all defendants except National Hockey League, Atlanta Hockey, Inc. and Nassau Sports.

Morris R. Brooke of Drinker, Biddle & Reath, Philadelphia, Pa., for defendant, Nassau Sports.

Edward W. Mullinix and Arthur H. Kahn of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and S. Phillip Heiner and A. Stephens Clay of Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for defendant, Atlanta Hockey, Inc.

HIGGINBOTHAM, District Judge.

## OPINION

### I.

### INTRODUCTION

Plaintiffs, Metropolitan Hockey Club, Inc. and Golden Blades Hockey, Inc. (hereinafter referred to as "M–GB"), are now before this Court pursuant to timely motions by defendants, Nassau Sports, Atlanta Hockey, Inc., and the National Hockey League and its member clubs, who seek against plaintiffs the ultimate supreme penalty—the irrevocable termination and dismissal with prejudice of plaintiffs' suit. The defendants' last motion for dismissal was filed on June 19, 1974; yet this is not the first time plaintiffs have been near death's door in this litigation. Thrice before M–GB had been warned with the most precise language possible that their conduct of non-compliance with the Court's critical orders had brought them teetering on the precipice of dismissal. On June 14, 1974, because of additional and willful non-compliance, M–GB were thrust from their precarious precipice into the irretractable abyss below where dismissal is certain and where immediate dismissal is required as a matter of law.

The motion of dismissal with prejudice is granted with full recognition of its terminal and dire consequences to plaintiffs, but in the course of this litigation M–GB have received every possible discretionary ruling in their favor so that they could continue to compete in this arena of litigation. The discretion was often granted most reluctantly and solely because of the Court's recognition that the opposing chief defense counsel were in every respect true superstars with extraordinary experiences and unlimited financial resources. Of course, plaintiffs in antitrust litigation play an important role as private attorneys-general for the vigorous enforcement of the antitrust laws, but even with that imprimatur there comes a point where Courts are not required to exceed the "patience of Job." Thus, there is a time, even in this hockey litigation, when the "penalty box" is inadequate to enforce the rules of the game. Tragically for their clients, plaintiffs have reached that point and dismissal is required both as a matter of discretion and also as a matter of law.

### II.

### HISTORY OF THE CASE

#### A. General Background.

For maximum comprehension of the compelling reasons motivating and indeed necessitating the Court's disposition in this matter, a detailed chronicle of the events preceding this motion is essential. Examining the totality of the facts herein presented, the imposition of the sanction of dismissal pursuant to Fed.R.Civ.P. 37(b)(2)(C) [1] is entirely

---

1. Fed.R.Civ.P. 37 provides in relevant part: "Failure to Make Discovery: Sanctions

       *     *     *     *     *

"(b) Failure to comply with order.

      *     *     *     *     *

"(2) Sanctions by court in which action is pending. If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party

fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

    *     *     *     *     *

"(C) An order striking out pleadings or parts thereof, or staying further proceed-

appropriate and justified under the circumstances.

The genesis of this litigation dates back to August 18, 1972, when the Philadelphia World Hockey Club, Inc. of the newly established World Hockey Association ("WHA") launched a massive, wide-ranging antitrust suit against the Philadelphia Hockey Club, Inc. of the older, prestigious National Hockey League ("NHL") and the member clubs of that league. This single civil action ultimately cascaded to number fifteen separate lawsuits, all of which were consolidated here in the Eastern District of Pennsylvania in accordance with either 28 U.S.C. § 1404(a)[2] or 28 U.S.C. § 1407(a)[3]. One of the actions transferred to this Court came from the Central District of California on October 11, 1972 and was captioned as the World Hockey Association v. National Hockey League, C.A. 72–1995. Included in that action as a plaintiff, and a defendant on the counterclaim, was Metropolitan Hockey Club, Inc. ("Metropolitan").

One facet of this mushrooming litigation culminated in the Court's filing an 124-page Opinion on November 8, 1972, less than three months after the initial suit was instituted and less than two months after the plaintiffs' motion for a preliminary injunction was lodged on September 19, 1972. Upon posting of a $2.5 million bond, this Opinion granted the plaintiffs (whose presence at this time encompassed Metropolitan) a preliminary injunction against enforcement of the NHL's controversial "reserve clause." See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462 (E.D.Pa.1972). This ruling by the Court constituted just one of the multitudinous directives issued during the course of this complex litigation.

Beginning in January 1973 the WHA's conducting of this litigation was coordinated primarily by Harold E. Kohn, Esquire, as lead counsel, and his law firm, Harold E. Kohn, P. A. Arguably, this representation embraced Metropolitan by reason of its status as a member of the WHA. Metropolitan's position nonetheless as to which counsel has represented its interest throughout these proceedings has been by no means entirely consistent, but evidently Metropolitan adheres to Emerson's philosophy that "a foolish consistency is the hobgoblin of little minds." Some of Metropolitan counsel's history, as well as its financial troubles, has been further highlighted and reported in the Court's Opinion of In re Professional Hockey Antitrust Litigation (Multidistrict Litigation), 371 F.Supp. 742 (E.D.Pa.1974).

**B.** *The Discovery Travail.*

The defendant NHL and its member clubs propounded and served interrogatories on Metropolitan and the other plaintiffs on February 2, 1973, more

---

ings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party; . . . "

2. 28 U.S.C. § 1404 states in pertinent part: "(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

3. 28 U.S.C. § 1407(a) reads: "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: *Provided, however,* That the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded."

than sixteen months ago. In accordance with Fed.R.Civ.P. 33(a)[4], Metropolitan's answers or objections thereto should have been provided by March 5, 1973. There was neither the timely submission of any responses or objections nor did Metropolitan request an extension of time so that its legal position would be adequately safeguarded.

The plaintiffs moved the Court for leave to amend their complaint on March 15, 1973. In order for the defendants' outstanding interrogatories to be tailored and conformed to any allegations contained in the new complaint, the defendants consequently redrafted the original interrogatories. Except for the defendants' efforts to dovetail the interrogatories to the specific paragraphs of the recent complaint, the substance of the first set of defendants' interrogatories was not significantly altered. This amended set of interrogatories was docketed on March 30, 1973. Even if the earlier deadline of March 5, 1973 could be discounted, Metropolitan's responses to the amended interrogatories would be due on April 30, 1973, giving plaintiffs the longer 45-day span permitted under Fed.R.Civ.P. 33(a). On April 30th as on March 5th, Metropolitan and the other plaintiffs had not replied nor had an extension of time been sought.

Approximately three months after the original interrogatories had been served, Metropolitan on May 4, 1973 moved for an extension of time, stating:

"Plaintiffs' counsel believes that it can file objections to defendants' interrogatories (approximately 170 pp.) and can substantially comply with the remainder of defendants' discovery requests by May 25, 1973. . . . ." [Plaintiffs'] Motion for Extension of Time at 2.

Defendants strenuously opposed this motion in a memorandum filed on May 7, 1973. On May 10th the Court granted the plaintiffs an extension until May 14th for noting their objections to the interrogatories, and until May 25th for providing answers. (N.T. of May 10, 1973 at 44–45.)

On May 15, 1973, a day past the deadline, the plaintiffs supplied their objections to the interrogatories which had been outstanding since February 2nd. In relevant part, the plaintiffs stated that they

"Object to all of the NHL defendants' interrogatories—consisting of 120 separately numbered paragraphs and literally hundreds of separate subparagraphs and sub-subparagraphs—in their entirety on the ground that the interrogatories indiscriminately sweep too broadly and are unduly burdensome, expensive and inefficient. Indeed, the length and breadth of scope of these interrogatories is merely an-

---

4. Fed.R.Civ.P. 33 states in relevant part:
"Interrogatories to Parties.
"(a) Availability; Procedures for Use. Any party may serve upon any other party written interrogatories to be answered by the party served or, if the party served is a public or private corporation or a partnership or association or governmental agency, by any officer or agent, who shall furnish such information as is available to the party. Interrogatories may, without leave of court, be served upon the plaintiff after commencement of the action and upon any other party with or after service of the summons and complaint upon that party.
"Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them. The party upon whom the interrogatories have been served shall serve a copy of the answers, and objections if any, within 30 days after the service of the interrogatories, except that a defendant may serve answers or objections within 45 days after service of the summons and complaint upon that defendant. The court may allow a shorter or longer time. The party submitting the interrogatories may move for an order under Rule 37(a) with respect to any objection to or other failure to answer an interrogatory."

other manifestation of the NHL's attempt to suppress competition by excessively burdening legal recourse by the injured WHA plaintiffs." (Plaintiffs' Objections to Defendants' Amended First Set of Interrogatories at 1–2.)

However, there were some objections to specific categories of interrogatories. Defendants on May 18, 1973 moved to compel answers to their amended first set of interrogatories.

■ On May 25, 1973, Metropolitan submitted its longly awaited answers to interrogatories which had been initially propounded on February 2, 1973, almost four months before. Metropolitan's answers *in their entirety* were embodied in a single paragraph:

> "Plaintiff Metropolitan Hockey Club, Inc. hereby incorporates, as its own answers, the answers to these same interrogatories filed by the World Hockey Association ('WHA') and other WHA plaintiffs and the documents produced by the WHA and other WHA plaintiffs, from which documents the NHL defendants may derive or ascertain answers with substantially the same effort and burden as may the WHA plaintiff hereby answering the interrogatories."

Even this "generous", all-encompassing answer did not comply with Fed.R.Civ.P. 33(a) in that it was unsigned and unsworn. Moreover, in contravention of Fed.R.Civ.P. 33(c),[5] the documents adverted to were wholly unspecified. Finally, many of the interrogatories were geared to obtaining information unique to Metropolitan or a specific club of the WHA, namely, interrogatories 2(a), 2(c), 2(d), 2(e), 2(g), 2(k), 2(m), 2(n), 2(o), 2(r), 2(s), 2(t), 2(v), 2(w), 2(x), 2(y), 2(z), 20(b), 21(d), 22(b), 23(c), 26(b), 30(b), 31, 32, 33, 34, 35, 36(e), 36(f), 36(i), 36(j), 36(k), 36(l), 36(m), 36(n), 36(o), 36(p), 36(q), 37(b), 37(f), 37(h), 37(i), 38, 39, 40, 41(c), 41(d), 41(e), 41(f), 41(g), 41(h), 41(n), 41(o), 41(p), 41(q), 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52(b), 52(c), 52(d), 53, 54, 55, 56, 58, 59, 60, 61, 62, 63, 64, 65, 66, 73, 75, 76, 77, 78, 79, 80, 82, 83, 84, 92, 96, 97, 98, 99, 100, 101(f), 101(g), 103, 104, 105, 107, 108, 109, 110, 111, 112, 116, 117 and 118. The damages allegedly sustained by Metropolitan as well as interrogatories relative to its financial structure were covered and this information was specifically requested. By the most liberal construction imaginable of the discovery provisions of the Federal Rules of Civil Procedure Metropolitan's "answer" after four months fell drastically short of any minimal good faith compliance.

On June 4, 1973, the defendants moved the Court to compel answers from plaintiffs. Around this period of time, however, the parties were realistically broaching the possibilities of settlement of this litigation. Thus the Court deferred taking any action on defendants' latest motion to compel, along with several other discovery motions, and the parties were going to endeavor to negotiate, hopefully obviating the necessity for any further Court intervention, at least on the purely discovery matters.

Negotiations continued throughout the summer and Fall of 1973. The Court nonetheless advised the parties during

---

5. Fed.R.Civ.P. 33(c) provides:

"Option to Produce Business Records. Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, or from a compilation, abstract or summary based thereon, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries."

the Fall that the case was scheduled for trial commencing March 18, 1974 in the event the extensive and protracted settlement sessions proved unsuccessful.

Pursuant to 28 U.S.C. § 1407(a), the Judicial Panel on Multidistrict Litigation transferred on January 4, 1974 several cases to the Eastern District of Pennsylvania from the Eastern District of New York, the Southern District of Texas, and the Central District of California. Among the parties included in those actions were Golden Blades Hockey, Inc. of the WHA ("Golden Blades") and Nassau Sports of the NHL ("Nassau").

At this juncture it would be appropriate to clarify the relationship of Golden Blades and Metropolitan. Some of this history is more amply described in another Opinion of the Court previously alluded to, which is reported at 371 F.Supp. 742 (E.D.Pa.1974), but the salient facts can be briefly summarized here. In early 1972 the WHA assigned to Metropolitan what the Court here shall generally designate as the New York franchise. When the hockey season began in the Fall of 1972, after paying only two player payrolls Metropolitan found itself in the position of being unable to meet its financial obligations including further payment of its players. Therefore the WHA interceded and assumed Metropolitan's financial obligations until May 11, 1973.

On May 11, 1973 Metropolitan was reorganized and became now Golden Blades. Metropolitan owns 200,000 of the 1,040,000 outstanding shares of Golden Blades Common Stock. Moreover, some of the same principals originally involved with Metropolitan are also associated with Golden Blades. When the 1973–1974 hockey season commenced in the Fall of 1973, after October 18, 1973 the WHA once again had to step in and financially assume responsibilities for the management and operation of this franchise.

One of the critical inquiries in this case, insofar as it pertains to Metropolitan and Golden Blades, will therefore be whether any of the damages allegedly sustained by either or both of these clubs were due primarily, if not solely, to the undercapitalization of the corporations. In other words, were the financial troubles plaguing Metropolitan and Golden Blades (hereinafter referred to as "M–GB"), *caused* by the purported monopolistic conduct and practices of the NHL and some of its member clubs, particularly Nassau, the New York Rangers and the Madison Square Garden Center of New York City.

On February 19, 1974 all of the sixteen member clubs of the NHL and eleven of the thirteen WHA teams (every club except for M–GB) agreed to settle all the antitrust claims and terminate the litigation. This settlement package was formally embodied in a Consent Decree which was approved by the Court at that time. Consequently, the only two plaintiffs remaining in the litigation were Metropolitan and Golden Blades or M–GB.

M–GB were going to prosecute the antitrust issues on their own behalf and would be represented by the New York City law firm of Golenbock and Barell. Leonard W. Wagman, Esquire and Michael C. Silberberg, Esquire, of that firm would be primary counsel. On February 20, 1974 the Court met with M–GB counsel and the attorneys representing the defendants to hammer out the final pretrial schedule so that the trial on the merits and the permanent injunction could begin as planned on March 18, 1974. At the February 20th session the defendants apprised the plaintiffs that there must be answers to the interrrogatories which were served on February 2, 1973 (N.T. of February 20, 1974 at 10–11).

At another pretrial conference held on February 22, 1974 M–GB counsel, speak-

ing through Mr. Wagman, stated to the Court unequivocally:

"I will answer the interrogatories, every one, if it is not objectionable. *We have the information, we will answer them.*" (Emphasis added.) (N.T. of February 22, 1974 at 66.)

On February 26, 1974, in another pretrial conference with the Court, the NHL counsel proposed that a hearing be conducted the next day, February 27th, on the outstanding motion to compel answers and, furthermore, that M–GB be required to file their answers by March 4th. (N.T. of February 26, 1974 at 11.) The Court inquired if the parties could confer and mutually agree on a pretrial schedule. After discussing the discovery questions outside the presence of the Court, the parties reported back that a hearing on the defendants' motion would be unnecessary since the M–GB had agreed to answer the interrogatories by March 11th, approximately two weeks later. This proposal was accepted and adopted by the Court. (N.T. of February 26, 1974 at 14–15 and 20.) At the February 26th session in deference to M–GB the trial date of March 18th was tentatively moved back to the week of April 1st or the week of April 8th. (N. T. of February 26, 1974 at 20–21.)

Once again M–GB did not honor their obligation to answer the interrogatories by March 11th. Instead of filing a motion on March 11th for an extension of time, M–GB wrote a letter to the Court on March 11th requesting an extension of time until March 18th to answer the interrogatories.

On March 13th the defendants moved to dismiss the action for M–GB's failure to answer the interrogatories. At a hearing scheduled the next day on March 14th, the Court denied the defendants' motion to dismiss and M–GB was given until March 18th to supply their answers. Nonetheless, in denying the motion, the Court admonished M–GB:

"I consider the memorandum of defendants in support of the motion to dismiss the claims of Metropolitan Hockey and Golden Blades Hockey to be a matter of substance and not to be frivolous in any way.

"The motion is necessarily addressed to the Court's discretion, and I rely on the cases which are cited in Professor Moore's treatise, Section 37.03[2.–5].

"As I review the cases which are cited under that category at 37–65 for cases in which dismissal was granted, there are some cases where, as an exercise of discretion, the courts have granted dismissals in cases of great substance and of substantial significance to the parties.

"This is the plaintiffs' second time before me where what I understood our pretrial schedule to be had been breached by plaintiffs.

"While I think it would be permissible to grant defendant's motion to dismiss as a matter of discretion, I do not grant it at this time, but I can not imagine on a similar circumstance if such a motion is made for any subsequent breach of the pretrial schedule that plaintiffs would be able to successfully defend against a motion to dismiss." (N.T. of March 14, 1974 at 46–47.)

On March 18th, M–GB submitted their answers to the year-old interrogatories. At a pretrial conference on March 19th the Court met with counsel and disclosed that the trial date for April increasingly seemed more jeopardized for a number of reasons and suggested that the parties consider a trial date of September 16, 1974. (N.T. of March 19, 1974 at 3–4.) During the conference the defendants were given until March 21st to file any motions, the plaintiffs were to respond by March 23rd and the matter would be listed for argument on March 25th.

On March 21st the defendants filed an extensive motion compelling supplementary answers to interrogatories which the defendants considered inadequately answered. When the motion was argued on March 25th the Court reminded M–GB of the significance of complying with deadlines:

"THE COURT: Mr. Silberberg [one of the M–GB counsel], let me tell you I was really distressed to get the call I got on Friday from Mr. Greenberg [one of the M–GB counsel] asking for an ex-parte extension in terms of your filing your memorandum.

"Dates mean something to me as a trial judge. When a lawyer is in my office and says he is going to do certain things by certain dates, I expect for them to be done. If he has to pull ten lawyers or three lawyers or four lawyers—I am not dealing with students in moot court. I am not dealing even with parties who are representing paupers to the extent of Community Legal Service, and they are understaffed. I am dealing with someone who says he is competent to handle an antitrust case, and I have given your colleague two or three extensions, almost against my better judgment, because I wanted to make sure I had done everything possible to see full justice, if possible, even though he may have been tardy and even though he had made commitments, and to have gotten that call on Friday was disturbing to me to the extent that I have not been in the ten years I have been here because I don't get constantly tested like that.

"I want you to tell Mr. Wagman and your colleagues if they want to play in this league, they have got to act like lawyers, and when you tell me you are going to do something on a date, I expect for it to be done.

"I was in here on Saturday. I come in on Saturdays and Sundays and work nights when it is necessary. You have got to do the same.

"So, that I just hope that it will not happen again because you are at the precipice." (N.T. of March 25, 1974 at 20–21.)

The Court in addition cautioned M–GB counsel at that March 25th hearing about the urgency of providing financial data of their clients so that defendants could adequately prepare their case. The Court examined M–GB counsel on this precise point:

"THE COURT: I want to ask you this question, looking down the line: Is there a point where you might be precluded from a line of damages because the defendants don't have access to the documents to defend on damages?

"MR. SILBERBERG: Your Honor, with respect to these particular records, these financial records the books of account that the WHA has and the stock-minute book which Mr. Marcus has, I addressed myself to that particular question in my papers, and we said that it was unreasonable as they had asked for us to attempt to obtain those records by April 5th, which is in a week, but we would make efforts, and we are going to make efforts to get them back. If we didn't get them back by June 15th, then there could be the type of order that Your Honor had suggested." (N.T. of March 25, 1974 at 29.)

Moreover, the Court admonished M–GB counsel:

"Well, I suggest you look over Moore's Commentary. You can get a preclusion of theories if you play around. Now, you gentlemen told me in chambers that you have got a case worth several million dollars. If I had a case worth several million dollars, I wouldn't deal with it lightly in terms of getting everything. I mean, if you are trying a nickel-and-dime case where you could collect $20 or $20,000, then you make $20 or $20,000 efforts, but on a case which apparent-

ly counsel fees alone have run $1,750,000, not to you, but to others on the plaintiffs' side, you have got to watch it carefully because I just think you are going to be in deep trouble." (N.T. of March 25, 1974 at 29–30.)

In a pretrial order dated April 1, 1974, the Court set July 15, 1974 as the last day for all the parties to complete the taking of depositions. On April 12, 1974 the Court filed a Memorandum Order (Pretrial Order No. 32) ruling on defendants' motion for supplementary answers. Generally, the Pretrial Order required M–GB to supplement a substantial number of answers by April 29, 1974. Notwithstanding the statement of M–GB counsel on February 22, 1974 that he had all the necessary information to answer the interrogatories, M–GB's principal argument as to why their answers were inadequate (of course not conceding that they were in fact inadequate) was that they had not been able to complete the necessary discovery.[6]

Bearing in mind that contention of M–GB, the Court required that some of the interrogatories "which the plaintiffs are unable to answer now due to inadequate discovery must be answered when the necessary discovery is completed and in any event no later than July 25, 1974," which was ten days after all discovery had to be terminated. (Memorandum Order of April 12, 1974 at 2.) Thus there would be some information provided to the defendants for the first time (almost two years after the litigation had begun) and at a time when they (the defendants) would be precluded from engaging in further discovery.

There was one group of interrogatories however that the plaintiffs were expressly directed to supplement on June 14, 1974, and this collection of interrogatories dealt with questions specifically related to damages sustained by M–GB.[7] The June 14th deadline was imposed so that the defendants would have at least a month upon receipt of the supplementary answers to conduct further discovery should it prove necessary. In the Court's view, the issues of damages and causation went to the core of the defendants' defense. As heretofore mentioned, fiscally M–GB were not your typical solvent organizations and some of their financial difficulties may have been internal. The Court stated in its Memorandum Order at 7–8:

"12. *Failure to Provide Specific Answers to Questions Relating to Damages.*

"The Court has previously advised the parties informally about the merits of this litigation. One area of crucial concern will be the damages sustained by Metropolitan and/or Golden Blades, assuming *arguendo* the causal nexus linking NHL and/or some of its member clubs is established by the plaintiffs. The Court finds that the answers thus far provided to interrogatories in this section are totally inad-

---

6. In this regard one should note that when the Judicial Panel on Multidistrict Litigation transferred several cases from the Eastern District of New York on January 4, 1974, one of the Judges sitting on the Panel, Edward Weinfeld, dissented, mainly because he believed those cases there were in a posture that they could be soon tried:

"I dissent insofar as the Nassau Sports v. Gary Peters, et al. [369 F.Supp. 1117] (E.D.N.Y. 72 Civ. 1086) and Nassau Sports v. Norman Ferguson, et al. [369 F.Supp. 1117] (E.D.N.Y. 72 Civ. 1132) actions are concerned. Upon the argument of this motion it appeared that discovery

in these matters was well advanced in the original district of commencement of suit and counsel represented that the cases were ripe for trial there. In the circumstances, a transfer would not be 'for the convenience of parties [nor] . . . promote the just and efficient conduct' of such action as required by 28 U.S.C., section 4107 [1407]. I would leave these actions where they are.

7. These were interrogatories 20(b); 21(d), 22(b), 23(c), 26(b), 30(b), 31(c)–(f), 33(d)–(o), 35(g)–(i), 36(c), (e), (f), (m)–(p), 37(c)–(e), 38(b)(1)–(6), (c), (d), 39(i)–(p), 41(a)–(b), (d)–(f).

equate, particularly with regard to any kind of *itemization* of damages.

"At this stage of the discovery, for whatever the reasons, the plaintiff might not be in a position to provide, with the specificity necessary, the precise information demanded. Accordingly, consistent with Guideline 5, *supra*, plaintiffs will be directed to supplement these answers whenever the data become available and in no event later than June 14, 1974. In this regard the plaintiffs are forewarned that the Court will be amenable to entertaining any motions under Fed.R.Civ.P. 37 should such information not be forthcoming by June 14, 1974."

The bulk of the supplementary answers of the plaintiffs were due on April 29, 1974. On April 17th, five days after the April 12th Memorandum Order, M–GB for the first time since they had been in the case ordered reproduction of documents contained in the official Court file which they asserted were necessary to supplement the answers. On April 24, 1974, Alan M. Lerner, Esquire, one of M–GB counsel, wrote the Court a letter in lieu of filing a motion, seeking an extension from April 29th to May 8th because of the Clerk of Court's inability to immediately Xerox the hundreds of documents suddenly requested by plaintiffs.[8] This extension was vigorously opposed by the defendants in a letter to the Court. The Court on April 29th however "reluctantly" granted an extension until May 6, 1974.

On May 6, 1974, the plaintiffs timely supplied their supplementary answers. Included in those answers were responses to interrogatories 33(g), 33(h), 33(i), and 33(j)–(k). These interrogatories were ones which related to damages and were due by June 14th. On June 14th *all* of the answers which touched upon damages and were cited in

footnote 7, *supra*, were required to be supplemented. However, notwithstanding the unambiguous warning by the Court on April 12th, M–GB had filed absolutely nothing. Five days *later* M–GB on June 19th filed a motion to amend Pretrial Order No. 32, the Memorandum Order of April 12, 1974, requesting the Court "to designate July 25, 1974 the date by which plaintiffs must file supplemental answers to all of defendants' Interrogatories." (Plaintiffs' Motion to Amend Pre-Trial Order No. 32 at 2.) To grant M–GB's request would in effect deprive the defendants of any opportunity to have discovery on the information provided on July 25, 1974.

On June 19, 1974 the defendants also filed this motion to dismiss for M–GB's failure to supplement their answers relating to damages and other financial matters.

Plaintiffs' motion to amend Pretrial Order No. 32 and defendants' motion to dismiss were argued before the Court on June 26, 1974.

## C. *The Damage Interrogatories.*

Since only a few of the damage interrogatories were supplemented by June 14, 1974 the Court will review the scope of the answers tendered by M–GB on March 18, 1974.

In M–GB's complaint at paragraph 28(a) they alleged that the defendants had combined and conspired "to threaten prospective players and coaches with 'blacklisting' by the NHL if they became associated with the members of the WHA." The defendants therefore asked M–GB to describe each and every instance when such "blacklisting" had occurred. In interrogatory 20(b), the defendants inquired further:

"as to each such instance [of blacklisting], state whether you claim that you suffered monetary damage as a result thereof and, if so, state the to-

---

8. We had two persons from the Clerk's Office work overtime and on one Saturday to comply with plaintiffs' urgent request for the Xeroxing of hundreds of documents.

tal amount of such damage and explain how it was computed."

M–GB responded to interrogatory 20(b) by stating:

"These threats of blacklisting resulted in each of the above-named players, other than Peters and Fergeson, and other players presently unknown to Metropolitan and Golden Blades deciding not to execute contracts with Metropolitan, Golden Blades and other WHA teams. This was one of several factors which prevented Metropolitan and Golden Blades from successfully entering the sub-market known as Major League Professional Hockey and from paying spectators, lucrative television and radio contracts, as well as substantial profits from various ancillary rights and precluded Metropolitan and Golden Blades from developing the New York franchise of the WHA to its fullest potential—that of being the most valuable franchise in the WHA. The effects of this damage is ongoing since Metropolitan and Golden Blades would have reasonably expected to earn substantial profits for many years to come and the New York franchise would have represented a substantial capital asset, all of which has been destroyed by the anticompetitive and monopolistic acts of the NHL defendants. Accordingly, Metropolitan and Golden Blades cannot state with certainty the amount of damages resulting from and attributable to these particular acts but believe such damages to be not less than $3,000,000."

This kind of general form language was given to virtually all these interrogatories relating to damages. To cite another example, paragraph 28(d) of M–GB's complaint alleged that defendants had combined and conspired "to disparage the WHA and its member clubs to coaches and players who either had signed or were considering or might consider contracts with plaintiffs." In Interrogatory 22(a), M–GB were asked to describe each such instance and in Interrogatory 22(b), as in interrogatory 20(b), they were required to disclose what damages had been sustained. With a slight variation in language, the same format was followed by M–GB in this answer:

"Upon information and belief, this disparagement of the financial ability of the WHA resulted in Metropolitan and Golden Blades being required to post enormous sums as guaranties for the salaries of players who had been signed, thus depriving Metropolitan and Golden Blades of substantial cash needed for their operations. This was one of several factors which prevented Metropolitan and Golden Blades from successfully entering the sub-market known as Major League Professional Hockey and from obtaining substantial profits from paying spectators, lucrative television and radio contracts, as well as substantial profits from various ancillary rights and precluded Metropolitan and Golden Blades from developing the New York franchise of the WHA to its fullest potential—that of being the most valuable franchise in the WHA. The effects of this damage is ongoing since Metropolitan and Golden Blades would have reasonably expected to earn substantial profits for many years to come and the New York franchise would have represented a substantial capital asset, all of which has been destroyed by the anti-competitive and monopolistic acts of the NHL defendants. Accordingly, Metropolitan and Golden Blades are unable to state with certainty at the present time, the precise amount of such damages resulting from and attributable to these particular acts, but believe such damages to be not less than $3,000,000."

Extracting one fragment of M–GB's answer to interrogatory 22(b) typifies the dilemma confronting the defendants. M–GB responded that "this disparage-

ment of the financial ability of the WHA resulted in Metropolitan and Golden Blades *being required to post enormous sums as guaranties for the salaries of players who had been signed, thus depriving Metropolitan and Golden Blades of substantial cash needed for their operations."* (Emphasis added.) Candidly, after more than one and one-half years since the complaint was filed in this action M–GB should have knowledge of what were these "enormous sums" they were required to post as guaranties. The defendants have no way whatsoever of ascertaining what these sums were except through discovery of M–GB.. These kinds of facts are purely within the knowledge of M–GB and only M–GB.

Interrogatory 21 corresponded to paragraph 28(c) of M–GB's complaint wherein they alleged that defendants had combined and conspired to devise a system of selling rights to players who have signed with plaintiffs to the NHL hockey club operating in the territory of the player's WHA club in order to better effectuate defendants' coercive efforts to disrupt the player's contract with the WHA hockey club. Interrogatory 21(d) called for M–GB's revealing the damages it had sustained. Again, M–GB's answer was as follows:

> "The actions of the NHL in transferring rights to such players was one of several factors which prevented Metropolitan and Golden Blades from successfully entering the sub-market known as Major League Professional Hockey and earning substantial profit from paying spectators, lucrative television and radio contracts, as well as substantial profit from various ancillary rights and precluded Metropolitan and Golden Blades from developing the New York franchise of the WHA to its fullest potential—that of being the most valuable franchise in the WHA. The effect of this damage is ongoing since Metropolitan and Golden Blades would have reasonably expected to earn substantial profits for

many years to come and the New York franchise would have represented a substantial capital asset, all of which has been destroyed by the anticompetitive and monopolistic acts of the NHL defendants. Accordingly, Metropolitan and Golden Blades are unable to state with certainty at the present time the precise amount of such damages resulting from and attributable to these particular acts, but believe such damages to be not less than $3,000,000."

Interrogatory 23 referred to allegations in paragraph 28(e) of M–GB's complaint that there had been "false and misleading press releases." Accordingly, in interrogatory 23(c), defendants asked:

> "as to each such press release referred to, state whether you claim that you suffered monetary damage as a result thereof and, if so, state the total amount of such damage and explain how it was computed."

And M–GB's answer was:

> "The issuance of such false and misleading press releases was one of several factors which prevented Metropolitan and Golden Blades from entering the sub-market known as Major League Professional Hockey and from obtaining sustantial profits from paying spectators, lucrative television and radio contrats, as well as substantial profits from various ancillary rights and precluded Metropolitan and Golden Blades from developing the New York franchise of the WHA to its fullest potential—that of being the most valuable franchise in the WHA. The effects of this damage is ongoing since Metropolitan and Golden Blades would have reasonably expected to earn substantial profits for many years to come and the New York franchise would have represented a substantial capital assets, all of which has been destroyed by the anti-competitive and monopolistic acts of the NHL defendants. Accordingly, Metropolitan

and Golden Blades are unable to state with certainty at the present time, the precise amount of such damages resulting from and attributable to these particular acts, but believe such damages to be not less than $3,000,000."

The Court will not unduly lengthen this Opinion by quoting again M–GB's answers, but they are illustrative of the kinds of information M–GB would provide to defendants after a year and a half of discovery. Form answers were provided to interrogatories 26(b), 30(b), 31(c)–(f), 35(g)–(i), 36(o)–(p), 37(c)–(e), 38(b)(1)–(6), 38(c), and 39(l)–(p). Some of the other interrogatories in this group were not even answered in the slightest.

The only answers of M–GB which contained the kind of specificity that could be of some use to the defendants came in answers to interrogatories 33(g)–(k), which were supplemented on May 6, 1974.

### D. Other Inadequate M–GB Answers.

Excluding those answers which had to be supplemented by July 25, 1974 even though many such answers went to the financial structure and operations of M–GB, and examining only those answers which M–GB were directed to supplement by May 6th, many of those were inadequate.

Interrogatories 34(s)–(u) were to be answered by May 6th. Interrogatory 34 generally corresponded to paragraph 38(c) of M–GB's Complaint which alleged that unlawful acts of defendants will continue to cause plaintiffs to "negotiate for the sale of the rights to broadcast plaintiff's hockey games on radio and television at far less favorable terms then the actual and reasonable value of such broadcasts."

Interrogatories 34(s)–(u) asked:

"(s) state the total amount of monetary damage which you claim you have suffered as of the end of the last full month prior to the date on which your answer to this interrogatory is filed as a result of being forced, due to the alleged unlawful acts of defendants, to sell the right to broadcast hockey games on radio and television at less than the actual and reasonable value of such broadcasts;

"(t) state the total amount of monetary damage which you claim you will suffer after the end of the last full month prior to the date on which your answer to this interrogatory is filed as a result of being forced, due to the alleged unlawful acts of defendants, to sell the right to broadcast hockey games on radio and television at less than the actual and reasonable value of such broadcasts and explain in detail how said amount was computed;

"(u) identify (or submit a copy of) all documents which support or are otherwise relevant to said allegation in paragraph 38(c) of the Complaint or which refer to, relate to or reflect any of the information called for in this interrogatory, and identify each person having knowledge of any such information."

On March 18, 1974 M–GB gave no answer at all to interrogatories 34(s)–(u). Instead, in their Memorandum of Metropolitan Hockey Club, Inc. and Golden Blades Hockey, Inc. in Opposition to Defendants' Motion to Compel Supplementary Answers to Interrogatories at 6, M–GB stated:

"M–GB concedes that it failed to file answers to 34(s) (t) and (v) [sic] and agrees to provide answers to these interrogatories in the supplemental answers they will hereafter file."

On May 6th M–GB's answers to interrogatories 34(s)–(u) were as follows:

"34. (s) (t) (u) The total amount of monetary damage suffered by Metropolitan and Golden Baldes as a result of being forced, due to the unlawful acts of defendants, to sell the right to broadcast hockey games on radio and television at less than the actual and reasonable value of such broadcasts

represents at the very least, the difference between monies actually received by Metropolitan and Golden Blades, set forth in the documents heretofore produced and identified in answer to interrogatories 34(a)–(*l*) and the monies received by the New York Rangers and New York Islanders for the right to broadcast and televise their games. Metropolitan and Golden Blades will be in a position to more specifically identify these amounts when they have completed their discovery and will file supplemental answers in accordance with the Court's guideline 5."

M–GB have almost entirely avoided answering interrogatory 35(e) which relates to paragraph 38(d) of their complaint wherein it was alleged that defendants' unlawful conduct caused plaintiffs to "suffer a reduction in the anticipated and actual revenue from the sale of tickets for both preseason and regular games." Interrogatory 35(e) asked M–GB to "explain how each of the claimed number of tickets, the claimed prices, and the claimed amounts set forth in answer to interrogatory 35(d) was computed." M–GB have a tendency to circumvent giving a specific answer by offering a broad conclusionary answer to several subparagraphs and thus not answering each particular aspect of the question.

M–GB were similarly evasive in answering interrogatory 44 which dealt with whether they had any policy as to the number of NHL players the plaintiffs would attempt to sign to a contract for the WHA 1972–1973 season or for any subsequent season. M–GB in answers to interrogatories 107(a)–(d) and 108(a)(1), (2) and (b) have disregarded providing dates as to when certain loans or escrow deposits were made.

## III.

## DISCUSSION

■ The leading Supreme Court authority construing Fed.R.Civ.P. 37 is So-

ciete Internationale v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), where the Court held, *inter alia*, that "[f]or purposes of subdivision (b)(2) of Rule 37, we think that a party 'refuses to obey' simply by failing to comply with an order." *Id.* at 208, 78 S.Ct. at 1094. Thus whether a party can be subjected to sanctions is not contingent upon a prior finding of *willfulness*, though some showing of willfulness may be necessary if the severe sanction of dismissal is invoked by the Court. See 4A Moore's Federal Practice ¶ 37.03[2.–1] at 37–55 to 37–56 (2d ed. 1974). The Supreme Court in *Rogers* elaborated on this delineation by noting that "Rule 37 should not be construed to authorize dismissal of this complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to *willfulness, bad faith, or any fault of petitioner.*" 357 U.S. at 212, 78 S.Ct. at 1096. (Emphasis added)

The 1970 Amendments to Rule 37 by substituting "failure" for "refusal" sought to clarify any ambiguity that may have existed due to *Rogers, supra,* and to minimize the problems of construction which had troubled the Courts. See Advisory Committee Note of 1970 to Amended Rule 37, 4A Moore's Federal Practice ¶ 37.01[8] at 37–23 (2d ed. 1974). See, also, 4A Moore's Federal Practice ¶ 37.01[8] at 37–27 and ¶ 37.-03[2.–1] at 37–51 to 37–52 (2d ed. 1974).

The Court of Appeals for the Third Circuit has acknowledged the importance of parties engaging in good faith discovery and fully answering interrogatories which have been propounded to them, with the failure to do so resulting in the imposition of the sanction of dismissal. In Mangano v. American Radiator & Standard San Corp., 438 F.2d 1187, 1188 (3d Cir. 1971), the Court remarked:

"Motions to dismiss were made in all four cases on the basis of plain-

tiffs' failure to file answers to interrogatories. Answers were required by orders to which the plaintiffs had consented. Time for answering had been extended. The district court indicated that, under the circumstances present here, the actions merited dismissal pursuant to Fed.R.Civ.P. 37(b)(2)[C] and 37(d) for failure to make responsive, and in some instances any, answers to proper interrogatories."

The lower Court Opinion clearly underscored the significance of imposing a sanction of dismissal, particularly where answers to interrogatories are *"totally inadequate and fail to provide essential information critical to the determination of which, if any, of the many plaintiffs in the present litigation are entitled to recover damages."* (Emphasis added.) Philadelphia Housing Authority v. American Radiator & Standard San Corp., 50 F.R.D. 13, 15 (E.D.Pa.1970). The Court continued at a later point by stating:

"In light of the flagrant disregard by plaintiffs of the discovery requirements of the Federal Rules of Civil Procedure and of the Order of this Court, the Court would be fully justified if, in the exercise of its discretion, it were to dismiss the claims of the present plaintiffs on the basis under Rule 37(b)(2)[C] or 37(d). Brookdale Mill, Inc. v. Rowley, 218 F. 2d 728 (6th Cir. 1954); Fond Du Lac Plaza, Inc. v. Reid, 47 F.R.D. 221 (E. D.Wis.1969); Shepard v. General Motors Corporation, 42 F.R.D. 425 (D.N.H.1967); *Accord,* Hastings v. Maritime Overseas Corporation, 411 F.2d 1201 (3d Cir. 1969); Diapulse Corporation of America v. Curtis Publishing Co., 374 F.2d 442 (2nd Cir. 1967); United States of America for the Use of Weston & Brooker Co. v. Continental Casualty Co., 303 F.2d 91 (4th Cir. 1962); Brady v. Hearst Corporation, 281 F.Supp. 637 (D. Mass.1968). *Such action is particu-*

*larly appropriate in complex antitrust litigation like that now before the Court where efficient and effective discovery procedures are essential to orderly adjudication.* Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 615 (2nd Cir. 1964)." *Id.* at 18–19. (Emphasis added)

■ The Court fully appreciates the harshness of the sanction of dismissal and does not lightly or cavalierly invoke it here. In an analogous context the Court is guided by the language of the Court of Appeals for the Second Circuit when, while expounding on the severity of the imposition of the judgment of default for failure of the parties to comply with discovery orders, it commented that such a severe sanction must be "tempered by the careful exercise of judicial discretion to assure that its imposition is merited." Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 614 (2d Cir. 1964). However, unless there is complete disclosure by the plaintiffs of all responsive and relevant information bearing on certain essential interrogatories pertaining to damages, the defendants will be afforded no opportunity to prepare their defense, particularly when one of the key elements of that defense will be predicated upon negating or reducing the type and amount of damages which plaintiffs contend are directly attributable to the conduct of the defendants. We know that each and every day some corporations fail solely because of their own inadequate financial capitalization regardless of whether they exist in a milieu of Sherman Act violations. Thus, it was imperative that defendants have sufficient data to differentiate whether the plaintiffs' failures were attributable to plaintiffs' financial inadequacies or to defendants' purported anti-competitive acts. Effective discovery is exceedingly vital so that defendants are enabled to prepare their cases *before* trial as opposed to being required to wait until the actual trial before the weaknesses or the strengths of the oppo-

nents' cases become known and are made apparent.

Courts today do not condone the "surprise" approach to discovery whereby at the latest possible moment the parties reveal the substance of their cases. If the discovery process is abused or allowed to be frustrated by the parties, then the entire pretrial procedures and the discovery provisions of the Federal Rules of Civil Procedure can be turned into a mockery. Time deadlines are imposed for valid reasons and there are prescribed procedures by which the time periods can be enlarged *if done in a timely fashion*. An underlying factor here is that a Court must be able to regulate and control in an orderly fashion the progress of discovery. Plaintiffs' counsel in the instant case are not inexperienced and just out of law school. Instead they are seasoned attorneys who know and comprehend the intricacies of federal practice and the importance of discovery in protracted litigation. Sanctions become meaningless unless they are applied when the circumstances demand them, though harsh they may be. After seventeen months where crucial interrogatories remained substantially unanswered despite numerous extensions granted at the eleventh hour and, in many instances, beyond the eleventh hour, and notwithstanding several admonitions by the Court and promises and commitments by the plaintiffs, the Court must and does conclude that the conduct of the plaintiffs demonstrates the callous disregard of responsibilities counsel owe to the Court and to their opponents. The practices of the plaintiffs exemplify flagrant bad faith when after being expressly directed to perform an act by a date certain, *viz.*, June 14, 1974, they failed to perform and compounded that noncompliance by waiting until five days afterwards before they filed any motions. Moreover, this action was taken in the face of warnings that their failure to provide certain information could result in the imposition of sanctions under Fed.R.Civ.P. 37. If the sanction of dismissal is not warranted by the circumstances of this case, then the Court can envisage no set of facts whereby that sanction should ever be applied.

In the alternative to applying the harsh sanction of dismissal, the defendants would be entitled to have certain facts taken as established under Fed.R.Civ.P. 37(b)(2)(A) and Fed.R.Civ.P. 37(d), and/or the entering of an Order pursuant to Fed.R.Civ.P. 37(b)(2)(B) precluding M–GB from offering proof at trial on the information pertaining to damages which was specifically solicited through the interrogatories.

Fed.R.Civ.P. 37(b) provides in relevant part:

\* \* \* \* \* \*

"(2) Sanctions by court in which action is pending. If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence."

See, also, Philadelphia Housing Authority v. American Radiator & Standard San. Corp., *supra*, 50 F.R.D. at 19; McMullen v. Travelers Insurance Company, 278 F.2d 834 (9th Cir. 1960), cert. denied, 364 U.S. 867, 81 S.Ct. 110, 5 L. Ed.2d 89 (1960); Iaconelli v. Anchor

Lines, Ltd., 51 F.R.D. 144, 147 (E.D.Pa. 1970); R. De Bouard & Cie v. S. S. Ionic Coast, 46 F.R.D. 1 (S.D.Texas 1969); and Life Music, Inc. v. Broadcast Music, Inc., 41 F.R.D. 16 (S.D.N.Y.1966).

If, among other facts, it is taken as established that neither Metropolitan nor Golden Blades suffered any ascertainable damages as a result of the policies or conduct of any of the defendants, or if the plaintiffs are precluded from introducing evidence at trial on the question of damages, then as a matter of law, the defendants are entitled to judgment in their favor. See, e. g., Association of Western Railways v. Riss & Co., 112 U.S.App.D.C. 49, 299 F.2d 133 (1962).