**LITTON SYSTEMS, INC., et al., Plaintiffs,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.**

**NEW YORK TELEPHONE COMPANY, et al., Counterclaimants,**

v.

**LITTON SYSTEMS, INC., et al., Counterdefendants.**

**76 Civ. 2512 (WCC).**

United States District Court, S. D. New York.

June 4, 1981.

Howrey & Simon, Washington, D. C., for plaintiffs-counterdefendants; William Simon, Washington, D. C., Peter E. Fleming, Jr., Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants-counterclaimants; Leonard Joseph, J. Paul McGrath, Harvey Kurzweil, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This case is presently before the Court on plaintiffs' objections to Magistrate Kent Sinclair, Jr.'s Findings and Conclusions on Motions for Discovery Sanctions dated April 16, 1981 and defendants' request for reconsideration of their motion under Rule 37(b)(2), F.R.Civ.P. for dismissal of this action or preclusion of plaintiffs' opposition to defendants' contention that plaintiffs' losses resulted solely from plaintiffs' mismanagement, incompetence and dishonesty.

In connection with the objections, the Court has reviewed the transcripts of the hearing held before Magistrate Sinclair on April 7, 9 and 10; defendants' Exhibits DX–M–1 through DX–M–6; the affidavit of Peter H. Jacoby dated April 11, 1981, and the defendants' post-hearing memorandum dated April 11, 1981; plaintiffs' Exhibits 1–84; the complete text of opinions and memoranda and the complete transcripts of those hearings before Magistrate Schreiber, Magistrate Sinclair and myself for which excerpts are included in these exhibits including the transcripts of hearings held before Magistrate Schreiber on April 25, July 10, July 12 and August 15, 1978; defendants' Memorandum in Support of Reconsideration of Magistrate's Rulings with respect to Production by Plaintiffs of Memoranda and Other Documents concerning Investigations of Plaintiffs' Mismanagement dated November 3, 1978 and plaintiffs' Response thereto dated November 10, 1978 and filed December 6, 1978; the two opinions of the Second Circuit Court of Appeals on defendants' petition for a writ of mandamus, No. 80–3061, filed February 20, 1981, and plaintiffs' motion for recall or modification, filed March 30, 1981; plaintiffs' exhibits numbered 1–51 on their sanctions motions (denominated PSM–1 through 51 hereafter); defendants' exhibits A through O on plaintiffs' sanctions motion; plaintiffs' offers of proof on document destruction and violation of discovery orders dated March 24 and April 10, 1981; defendants' and plaintiffs' post hearing memoranda dated April 14 and 15, respectively, filed before Magistrate

Sinclair on plaintiffs' motion for sanctions; plaintiffs' objections to Magistrate's findings, defendants' responses to the objections, and plaintiffs' replies. This opinion represents the Court's *de novo* determination under 28 U.S.C. § 636 of the matters resolved by the Magistrate's findings, see *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

This Opinion and Order will first address plaintiffs' objections to the Magistrate's findings on defendants' motion for discovery sanctions against plaintiffs; then plaintiffs' objections to the Magistrate's findings on plaintiffs' motion for discovery sanctions against defendants; and, finally, the issue of what sanctions may appropriately be imposed here under Rule 37, F.R. Civ.P.

## I. Objections to the Magistrate's findings on defendants' motion for sanctions

The documents whose production is at issue on defendants' motion for sanctions relate to the defense raised by American Telephone and Telegraph Company ("AT&T") and its affiliates that even if defendants were found to have committed violations of the antitrust laws by restraining trade or monopolizing the sale and leasing of telephone terminal equipment, plaintiffs suffered no damage thereby since Litton Business Telephone Systems ("Litton BTS") went out of business solely as a result of mismanagement, incompetence and dishonesty. Defendants raised and the Magistrate reviewed three areas in which, defendants contended, plaintiffs' response to discovery requests and orders covering documents related to the mismanagement defense was so inadequate as to warrant imposition of sanctions: late production of

the "Mellor memorandum," marked DX–1 at trial; late production of the "Slush Fund Documents," DX–M–2, attachments Q, R and S; and failure to produce in a timely manner certain handwritten notes taken by Litton Defense Systems Group Counsel Norman L. Roberts ("Roberts notes"). The Magistrate concluded that late production in the first two areas was not, on the record before him, wilful or grossly negligent, but that the record on discovery of the Roberts notes

> "disclose[s] a pattern of intentional concealment of evidence, achieved in part by several false statements made to defense counsel and the court over a period of approximately two years by plaintiffs' counsel, who knew of the falsity of the representations and intended that defendants and the court be misled." Findings at 3.

Plaintiffs raise objections only to the Magistrate's conclusions as to the Roberts notes.

I find the objections to be without merit; adopt the Magistrate's findings numbered 20 through 74 [1]; and conclude:

■ 1. Plaintiffs were grossly negligent in representing to defendants at Roberts' deposition on March 23, 1977, see Exhibit 2, that the only Roberts documents called for by defendants' deposition document request which were not being produced were handwritten notes and typewritten summaries of Roberts' interviews with the four Litton BTS employees indicted in connection with the bribery of a purchasing official of San Mateo Community College, namely, Leonard Mende, Byron Sando, Bryan Selph and John Barbour,[2] and with Matteo Fasanaro, the bribed official.

[1] This adoption is with one caveat as to the implication in Paragraph 52 of the findings that the omissions in the typewritten summaries of Roberts' interviews with Mende, Sando, Barbour and Fasanaro and Selph's typewritten statement were material. While the handwritten notes are not identical to the typed versions, the typed versions are in many instances more informative than the pencil notes, and I am of the opinion that the omissions from the typed versions are by and large insignificant,

with the exception of the omission of the contents of page 19. Moreover, the text of page 19 of the handwritten notes, while admittedly colorful, does not appreciably add to defendants' store of information regarding Litton BTS.

[2] Leonard Mende was Executive Vice President of Litton BTS. Byron Sando was BTS Northwest Regional Manager. Bryan Selph was manager of BTS's Sunnyvale branch. John Barbour was Vice President of Sales at BTS.

The document request submitted to plaintiffs before Roberts' 1977 deposition called for, among other items,

"5. All documents evidencing, constituting, or referring or relating in any way to any payment of possibly unlawful or improper payments, premiums or gifts, including but not limited to bribes, kickbacks, finders' fees, referral fees or commissions, in connection with the purchase or other procurement or the sale, leasing or other marketing or distribution by any Litton company of telephone terminal equipment or services . . . .

"7. All documents evidencing, or referring or relating in any way to any interview, investigation, audit or other review of any occurrences, practices, tactics or strategies . . . in the purchase . . . sale . . . or distribution of telephone terminal equipment . . . .

"8. All documents referring or relating in any way to . . .

. . . John Barbour

. . . Vic Chambers

. . . Matteo Fasanaro

. . . John Gabor

. . . Slater Hawkins

. . . Lowell Hoxie

. . . Byron Sando . . . ."

DX–M–7, Exhibit G.

In discussing production in response to this request, Theodore Craver, Litton in-house counsel, and Roberts, also an attorney, made the following representations:

"MR. CRAVER: Maybe to shorten it I could state for the record, since I made the production of Mr. Roberts' documents responsive to the subpoena, that handwritten notes by Mr. Roberts and typewritten copies or versions, typewritten versions of those handwritten notes reflecting interviews with Messrs. Mende, Sando, Selph and Barbour were not produced on the ground that they would

reflect the mental processes of Litton's counsel, and, therefore, are attorney work product and also are privileged under the attorney-client rule. And I believe I am correct in the names of the witnesses.

"THE WITNESS: Mende, Barbour, Sando and Selph.

[. . .]

"Q. Are there any other documents Mr. Roberts, that were withheld?

"A. Not that I can recall.

"MR. CRAVER: No. There were no others."

Transcript of 1977 Roberts' deposition, Exhibit 2, at 6.

In the course of the deposition, Roberts also disclosed that notes of his interview with Fasanaro were being withheld. Tr. at 34.

However, Roberts had taken additional notes of an initial meeting with Robert Bruder[3] in which Roberts was instructed to begin his investigation, and of interviews with Litton BTS employees Lowell Hoxie, Jim Gillece, John McClure, Vic Chambers and John Gabor.[4] Roberts testified at the 1981 sanctions hearing that he kept a file of these notes, which was apparently in his desk at the time of the 1977 deposition. S.Tr. at 106. The notes of interviews with Hoxie, Chambers and Gabor are specifically called for by the document request; the notes of interviews with Gabor and McClure contain references to Barbour, Sando, and Slater Hawkins, also specifically referred to in Item 8 of the request; and all the nondisclosed notes fall within the more general requests of Items 5 and 7. Roberts' file of these notes could and should have been reviewed before plaintiffs represented that no documents other than the notes of interviews with the San Mateo principals had not been produced.

Plaintiffs contend that they were not grossly negligent because the file containing the nondisclosed notes may have been

**3.** Robert I. Bruder was the president of Litton BTS. He became president in late August or early September 1973.

**4.** Lowell Hoxie was BTS Vice President for Marketing and Administration. Jim Gillece

was BTS Vice President for National Accounts. John McClure was manager of the Seattle branch of BTS. Vic Chambers was manager of the Oakland branch of BTS. John Gabor was an administrative assistant to Barbour.

kept apart from the file containing the San Mateo interview notes, so that Craver may not have known about the other file at the time he made his statement. Craver in fact testified at the 1981 sanctions hearing that he was not aware in 1977 that there were any additional Roberts notes. However, Roberts, who deferred to Craver at the deposition, knew about the nondisclosed notes file; and any lack of knowledge by Craver as to the existence of the nondisclosed notes does not excuse Craver's and Roberts' failure to review all of Roberts' files before representing that no other notes were being withheld. Moreover, Craver's further testimony at the 1981 hearing that in 1977 he "didn't know there were any other interviews," S.Tr. at 225, and did not learn of Roberts' interviews other than those with the San Mateo principals until 1979, is clearly incorrect. As already noted, Craver was present at Roberts' 1977 deposition in which Roberts testified that he and Hagerman had spoken to "various employees of the division," Exhibit 2 at 30, not just the indictees, and this testimony was emphasized by repeated questioning of Roberts concerning any others he had interviewed.[5]

2. Plaintiffs' counsel were grossly negligent in representing in their brief filed on April 24, 1978 that the investigation instigated by Bruder in 1973 was directed only at the San Mateo matter, see Exhibit 10 at 2. In fact, Roberts' notes of his meeting with Bruder on September 9, 1973 clearly show that San Mateo was only one of seven instances of suspected serious misconduct which Bruder wanted investigated, see documents numbered AJT 0070899–901, and his notes of the actual interviews show he interrogated the interviewees as to whether finder's fees had been paid by BTS offices in Seattle and Oakland, and whether there were other types of skimming by BTS employees. Counsel's misleading statements concerning the scope of the investigation were highly material in connection with the mismanagement defense because, while bribery of purchasing agents offends both

ethical standards and criminal statutes, it is intended to benefit the offending company, whereas employee embezzlement and misapplication of funds never do.

Plaintiffs' counsel were also grossly negligent in representing in that same brief that all of Roberts' interview notes had been turned over to the San Mateo County District Attorney. In fact, the notes of interviews with Hoxie, Gillece, Chambers, Gabor and McClure were never turned over to anyone other than Litton outside counsel Felice Cutler, who represented Litton in connection with a lawsuit filed by Mende in the Eastern District of New York, S.Tr. at 106, 109.

■ 3. Plaintiffs' counsel were again grossly negligent in representing at page 3 of their brief dated November 10, 1978 and filed December 6, 1978 that they had produced all "notes and memoranda of interviews of persons not connected with the San Mateo matter." Exhibit 21. At that time, Roberts' notes of interviews with Hoxie, Gillece, McClure, Chambers and Gabor were apparently in the possession of Litton's counsel Felice Cutler, S.Tr. at 106–07; these notes had not been produced to defendants.

4. Plaintiffs' counsel were grossly negligent in failing to turn over to defendants the Roberts notes of interviews with the San Mateo principals following my Opinion and Order of March 26, 1979.

Plaintiffs' current assertion that they did not turn over these notes because the notes were not physically contained in John Hagerman's file labelled "140–90," and thus not called for by the Order, see plaintiffs' objections of April 27, 1981 at 63, is wholly unconvincing. These Roberts interviews were specifically discussed at the pre-motion conference which preceded the briefing on the motion decided by the March 26, 1979 Opinion and Order:

> "MR. O'BRIEN: ... I was under the impression that the issue before the

---

5. Plaintiffs' counsel were hardly unaware of this statement by Roberts, as they relied on it heavily in their December 1980 submissions to

this Court in response to defendants' motion for sanctions.

Court today was defendants' appeal from Magistrate Schreiber's ruling denying defendants access to certain investigative reports relating to the San Mateo situation—

"THE COURT: That's what I am talking about.

[ ... ]

"MR. O'BRIEN: These were memoranda prepared by an attorney reflecting interviews that he conducted along with the head of security of Litton with certain persons who were involved in the San Mateo matter. The defendants have had a full range of discovery on the San Mateo matter.

"THE COURT: Including the identity of all these persons interviewed?

"MR. O'BRIEN: Oh, yes." [6]

Exhibit 18, transcript of October 27, 1978 conference at 2–3.

In my March 26 Opinion and Order, I identified Roberts' activities in interviewing Litton BTS employees at Bruder's request as "investigation ... No. 140–90," *id.* at 1, and specifically discussed the notes taken by Roberts during the "investigation," *id.* at 4. I rejected plaintiffs' argument, previously adopted by Magistrate Schreiber, that work-product immunity attached to the interview reports, and directed plaintiffs to furnish defendants "copies of all notes, reports and memoranda of interviews conducted in the course of said investigation No. 140–90" (*not* "file No. 140–90"). *Id.* at 7. This Order clearly encompassed the September 10, 1973 interviews conducted by Roberts; in fact, the Order specifically refers to Roberts' September 10, 1973 interview with Leonard Mende, *id.* at 3.

When plaintiffs failed to turn over the Roberts notes of interviews with the San Mateo principals (see Exhibit 8), defendants moved to compel production before Magistrate Sinclair, and the Magistrate directed that plaintiffs turn these Roberts notes over to him for *in camera* inspection. Discovery Order 100. At that time, plaintiffs

argued, see Exhibits 27 and 29, that they had not produced the Roberts notes because "investigation 140–90" was not initiated until September 22, 1973 and the Roberts interviews (most of which were conducted on September 10, 1973) thus predated the investigation. This argument is equally inadequate as a justification for plaintiffs' failure to turn over the Roberts notes of the interviews with the indictees after March 26. Not only is it inconsistent with the March 26, 1979 Opinion, see *id.* at 1, 3, 7, but it is inaccurate in light of the document purportedly relied on, John Hagerman's New Case Form dated September 22, 1973 opening "File 140–90," which reads:

"This case was predicated upon information received from Mr. Robert I. Bruder, President, BTS, on Monday September 10, 1973. Bruder explained that during his first 10 to 15 days on the job as the new president of the division he had determined serious irregularities in the sales department of the company. Bruder said that there were numerous incidents of 'finder's fees' in which the finder was not a legitimate individual or entity connected with the inter-connect business.

"Norm Roberts and the writer conducted *a series of interviews beginning on September 10* at the BTS division, the results of which are reflected in this file." Exhibit 23. (Emphasis added).

█ 5. The representation of plaintiffs' attorney Francis O'Brien in his letter of July 6, 1979, Exhibit 34, that Roberts had taken no notes of his interview with Hoxie was grossly negligent. The correspondence shows that defendants requested these notes after Hoxie testified in his June 1979 deposition that he had been interviewed by Roberts, Exhibit 32. O'Brien's letter in response states: "plaintiffs' counsel have checked with Mr. Roberts and he informs us that there were no notes, memoranda or reports of the interview with Mr. Hoxie," Exhibit 34. Even without the benefit of

---

**6.** An incorrect representation: defendants did not then know that Hoxie, Gillece, Chambers,

McClure and Gabor had been interviewed.

hindsight (*i. e.*, the subsequent discovery of such notes), it is clear that Roberts' recollection of the interviews in general and of his note-taking in particular was poor and had been so since at least 1977, see, *e. g.*, Exhibit 2, transcript of Roberts' 1977 deposition at 30, 31, 91 (Roberts' failure to remember interview with Chambers). Plaintiffs' counsel could easily have checked the file of Roberts notes before responding, instead of relying on Roberts' memory and, under the circumstances, their failure to do so is unsupportable.

■ 6. The failure of plaintiffs' counsel, Howrey & Simon, after their receipt of the complete set of Roberts' interview notes in the "late summer" of 1979, S.Tr. at 211, 218, to apprise the Magistrate, the District Court and defendants of the existence of the additional notes, to correct their then obviously incorrect assertions in 1978 and 1979 that no such notes existed, or to add these notes specifically to their log of documents for which a privilege was asserted was wilful misconduct. Roberts' interview notes had been the subject of dispute before the Magistrate and the District Court since 1978; the notes as they were represented to exist had been the subject of at least three Court opinions or written rulings during the period from March through August 1979, namely, my Opinion and Order of March 26, and Discovery Orders 100 and 109. Plaintiffs had an obligation to defendants and to the Court to correct their prior misstatements, in particular with respect to the Hoxie notes, whose existence attorney Francis O'Brien had denied as recently as July 6, 1979. Their argument that later production sufficed is unavailing. At the time Howrey & Simon received the notes, Magistrate Sinclair had recently urged the prompt production of the notes of interviews with Mende, Barbour, Selph, Sando and Fasanaro, see Discovery Order 109; further discovery was at that point being arranged with an eye toward a scheduled trial date of January 7, 1980; and plain-

tiffs' failure to make prompt disclosure could have seriously prejudiced defendants' ability to prepare for trial.

Discovery was stayed in the case from September 1979 to early 1980 while defendants' motion to dismiss or for partial summary judgment, plaintiffs' motion for summary judgment, and plaintiffs' motion to disqualify Magistrate Sinclair were under consideration. When Magistrate Sinclair resumed his review of discovery progress, the Roberts notes again became the subject of contention, see, *e. g.*, Discovery Orders 126, 128 (which cautions that plaintiffs' further delay in producing the notes will result in Rule 37(b) sanctions) and 129. Plaintiffs' failure to indicate during this period that additional Roberts notes had come to light is inexplicable.[7]

■ Plaintiffs' current argument that they did not disclose the existence of the additional Roberts notes in August 1979 because they viewed the documents as privileged is specious. To assert a claim of privilege, plaintiffs were required by discovery orders, see DX-M-6, Attachment 9, order of Magistrate Schreiber, to list documents as to which a privilege was asserted on their privilege logs, to apprise defendants of the type of privilege asserted, and, if defendants contested the assertion of privilege, to submit the documents for review to Special Master Joseph McLaughlin. Failure to record a claim of privilege in accordance with this procedure effectively waives any privilege or immunity which might otherwise be asserted with respect to the documents, see, *e. g.*, Magistrate Sinclair's Order on Plaintiffs' Appeal from and Defendants' Objections to the Thirteenth Final Report of the Special Master, filed December 23, 1980. Since Litton is barred from asserting a claim of privilege as to the documents, they may not, *a fortiori*, raise their alleged intent to assert such a claim as an excuse for their failure even to inform the Court and opposing counsel of the documents' existence.

7. Indeed, the full set of notes were not turned over until Magistrate Sinclair and this Court had issued two further Opinions in October

1979 Discovery Order 143 and Opinion and Order of October 24, 1980.

7. After plaintiffs produced the hand-written copies of Roberts notes of interviews with Barbour, Mende, Selph and Sando, DX–M–6, attachment 17, defendants wrote requesting information as to why gaps existed in the numbering of the pages of these notes, Jacoby Affidavit of April 11, 1981, Exhibit C. On September 5, 1980, Howrey & Simon, by Francis O'Brien, replied:

> "As for your query regarding the numbering of the notes, I am informed that Mr. Roberts intermingled in the same note pad his interview notes regarding the San Mateo matter with notes he made regarding other matters and numbered all of the pages consecutively. The appearance of gaps in the numbering of the pages dealing with the San Mateo interviews reflects the fact that intervening pages from Mr. Roberts' note pad dealt with other matters *wholly extraneous* to this case.
>
> "I trust this explanation will finally put this matter to rest so that we can get on with the important work of preparing this case for trial."
>
> Exhibit 59 (DX–M–6, attachment 18) at 1–2 (emphasis added).

■ The "intervening pages from Mr. Roberts' note pad" in fact contain notes of Roberts' initial meeting with Bruder to discuss seven instances of suspected misconduct at BTS, including San Mateo; Roberts' interview with Gabor, discussing, among other things, the use of the fake finder "Slater Hawkins"; Roberts' interview with Oakland branch salesman Vic Chambers (an interview Roberts did not remember conducting when asked in 1977, see Exhibit 2) about, among other things, finders' fees promised to Chambers, and listing of "Systems and Operations" as a false finder; a similar interview with McClure of Seattle; and an interview with Gillece in which Gillece asserted that "95% of finders' fees [paid by Litton BTS were] ˙ false." O'Brien's assertion that these pages had not been produced along with the other hand-written Roberts notes because they "dealt with other matters wholly extraneous to

this case" was wilful misconduct. At the time O'Brien wrote the letter, the complete file of the Roberts notes had been in Howrey & Simon's possession for over a year, S.Tr. at 211, 219. If O'Brien had reviewed the file before responding to defendants' letter, he could not in good faith have asserted that the matters on the numbered pages cited in defendants' letter were "wholly extraneous." O'Brien was aware that this file had been delivered to Howrey & Simon: he testified that he himself had obtained copies of the other Roberts interview notes (the ones contained on the missing numbered pages cited in defendants' letter) in August 1979, S.Tr. at 211, 218–19. It is clear that Howrey & Simon still had the notes at the time of O'Brien's letter because another attorney at Howrey & Simon had reviewed the file not long before, see Exhibit 57 (letter to defendants' counsel dated August 22, 1980 enclosing copies of Roberts handwritten notes of the Selph, Sando, Barbour and Mende interviews, as well as a typed report of a Fasanaro-related interview) in order to select those handwritten pages to be photocopied and sent to defendants. It is inconceivable that O'Brien was unaware of his firm's possession of the notes, so that if he indeed failed to review the notes themselves before responding to defendants' letter he was guilty of conscious avoidance of knowledge, tantamount to knowing misrepresentation.

The argument raised in plaintiffs' objections and reply papers on the Magistrate's sanctions findings that this falsehood should be excused because O'Brien's statement was based on a communication with Roberts in which Roberts advised Howrey & Simon that the missing numbered pages were extraneous is wholly unpersuasive in light of the sanctions hearing testimony that since August 1979 Howrey & Simon had been in possession of *the file itself*, obviously the most reliable source of information as to the contents of the missing pages.

## II. Objections to the Magistrate's findings on plaintiffs' motion for sanctions

Plaintiffs' motion for sanctions encompasses a general challenge to defendants'

document search guidelines; specific allegations of bad faith in connection with defendants' failure to produce or late production of documents generated by the Tariff Review Group, marketing memoranda and reports from Illinois Bell Telephone Company ("Illinois Bell") and documents relating to International Business Machines ("IBM") and its private branch exchange ("PBX") products; allegations that defendants' attorneys attempted to conceal a Bell System internal investigation into charges made by former employee Leigh Tripoli respecting widespread improper document destruction by Bell companies; and allegations of misrepresentation and improper withholding of documents by counsel for Mountain States Telephone and Telegraph Company ("Mountain Bell").

Magistrate Sinclair concluded that the matters raised in plaintiffs' motion had, for the most part, been heard previously and resolved, and that, as to the new matters raised, plaintiffs had failed to show negligent or intentional failure to make discovery on the part of defendants. He concluded that plaintiffs' motion for sanctions should be denied. For the reasons stated below, I agree.

■ 1. The Magistrate's findings 95–100 on general search guidelines are fully supported in the record. Plaintiffs have failed to show, either with documentary submissions or at the sanctions hearing, any indication that defendants' document search guidelines, as approved by Magistrate Schreiber, see the transcript of the May 30, 1978 conference before the Magistrate at 70 (excerpted at defendants' Exhibit C), and by Magistrate Sinclair, see Discovery Order 17, were unreasonable as drafted or applied.

■ 2. The record fully supports Magistrate Sinclair's findings with respect to defendants' production to Litton of Tariff Review Group documents.[8] There is no basis in the record from which to conclude that defendants' failure to produce the report numbered PX 5025 at trial (P–48 at the sanctions hearing, PSM Exhibit 15) was wilful or grossly negligent, or that the charts attached to the report as it was produced in *United States v. AT&T*, see PSM Exhibit 21, were wilfully omitted from the documents produced here; or that defendants have withheld any 1967–69 minutes of the Tariff Review Group; or that defendants negligently or wilfully failed to produce to Litton other documents produced to the government in the government's case.

■ 3. There is no evidence of gross negligence or wilfulness in the nonproduction of PX 1966, PSM Exhibit 27, or PX 1971A, PSM Exhibit 29.

4. As Magistrate Sinclair stated in Findings 108 and 109, defendants' efforts to locate the IBM Competitive Profile listed in PX 1002, PSM Exhibit 30, appear entirely appropriate. There is no proof of gross negligence or wilful nonproduction.

■ 5. Plaintiffs' suggestion that defendants improperly concealed results of an internal Bell investigation into charges of document destruction made by AT&T employee Leigh Tripoli is unsupported. The extensive record on the Tripoli matter discloses that, while defendants thoroughly contested their obligations to submit Tripoli-related documents for review, they adequately disclosed the existence of the documents and did not hinder the Special Master's review of the documents. See transcript of pretrial conference of October 4, 1978 before Magistrate Sinclair, 45–47; Dis-

---

8. Two of the Magistrate's findings with respect to the documents themselves appear to be in error. First, as noted by defendants, see Defendants' Response to Plaintiffs' Objections to the Proposed Findings of the Magistrate with respect to Plaintiffs' Motion for Sanctions, dated May 6, 1981, at 12, the task force report described as the second report in Magistrate Sinclair's Finding 105 was made available to plaintiffs for copying, but not copied by them.

See also letter from Leonard Joseph to Magistrate Kent Sinclair, Jr., April 17, 1981, Plaintiffs' Sanctions Motion Exhibit 14. Second, the Magistrate's conclusion in paragraph 104 that the Salzman memorandum, PSM Exhibit 25, is wholly contained in PX 5025, PSM Exhibit 15, is not wholly accurate, although substantial portions of the Salzman memorandum are contained, either verbatim or in substantial reproduction, in PX 5025.

covery Orders 1, 39, 42, 43, 117 and 123; Twenty-Fifth and Twenty-Ninth Reports of the Special Master; and Magistrate Sinclair's Order on Appeal from the Twenty-Fifth Final Report of the Special Master, citing this Court's ruling of January 8, 1981.

██ 6. The record on production of the Mountain Bell documents discussed in Magistrate Sinclair's Findings 114 and 115 does not support a finding of sanctionable conduct by defendants. While Mountain Bell's attorney Dan E. Spicer may have been negligent in failing to send the thirty-one withdrawn documents to defendants' counsel for inclusion on defendants' privilege logs between September 1977 and July 1980, see Magistrate Sinclair's Order on Plaintiffs' Appeal from and Defendants' Objections to the Thirteenth Final Report of the Special Master at 1–3, in the absence of any misrepresentations by Spicer as to the existence of the documents prior to their withdrawal from production, or of any conduct other than the delay—by Mountain Bell counsel, not counsel for defendants [9]—in adding the documents to the privilege log from which an inference of gross negligence or wilfulness could be drawn, there is no basis for concluding that sanctions should be imposed.

In summary, plaintiffs' motion for sanctions is so lacking in significant merit that it appears to have been filed only to parry and deflect some of the force of defendants' motion for sanctions.[10]

### III. Sanctions

The present posture of the case suggests that the Court should defer decision on the sanctions to be imposed until the conclusion of the presently ongoing jury trial.

██ Plaintiffs' misrepresentations as to the existence of certain of the Roberts notes, failure to produce the notes of interviews with the indicted parties after the Court's order that they do so, failure to correct their previous misrepresentations as to the other notes once the notes were retrieved from outside counsel Cutler, and false assertion that these further notes were "wholly extraneous" to the case merit substantial sanctions. However, the propriety in this case of the particular sanctions sought by defendants—outright dismissal of the complaint or preclusion of plaintiffs' opposition to the mismanagement defense, which would be tantamount to dismissal since it would preclude any recovery of damages—is subject to question. While such sanctions have indeed been imposed in cases in which a party's failure to comply with discovery obligations is due to wilfulness, bad faith or gross negligence, see *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Cine Forty-Second St. Theatre v. Allied Artists*, 602 F.2d 1062 (2d Cir. 1979), the Second Circuit has also cautioned that they should "be deployed only in rare situations," *Cine, supra,* 602 F.2d at 1064; *TWA v. Hughes*, 332 F.2d 602, 614–15

---

**9.** Under a stipulation entered into when Magistrate Schreiber was supervising discovery, defendants agreed to make available for production certain documents of non-defendant operating companies included in plaintiffs' document demand of January 6, 1976 addressed to AT&T. Production from Mountain Bell was supervised by Spicer, and the record confirms Magistrate Sinclair's finding that defendants' counsel were not directly involved with Spicer's withdrawal of documents made available for photocopying or with the September 1977 to July 1980 delay in moving to add the documents to defendants' privilege logs. In light of defendants' overall undertaking to produce documents from nondefendant operating companies, however, the lack of direct involvement

by defendants' counsel in the withdrawal of documents or the initial time lag in raising privilege claims as to those documents does not by itself exonerate defendants from responsibility for the withdrawal or the delay.

**10.** Plaintiffs' further submission of May 28, 1981 indicates that plaintiffs have obtained two additional documents from the trial record in the government case which, they contend, should have been produced here. The fact that certain documents were produced in that case—with its broader scope and reach of discovery—and not in this case does not, without more, establish gross negligence or wilful misconduct.

(2d Cir. 1964). Such extreme sanctions may not be appropriate where the nondisclosure was not, as were the nondisclosures in *National Hockey League* or *Cine*, of information "crucial" to defendants' case, but rather, as here, of documents whose earlier production merely would have aided defendants in preparing for trial a defense on which they have submitted voluminous other evidence; and where the policy interest in deterrence of misconduct during discovery, *Roadway Express v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980), must be balanced against the public interest in enforcement of the antitrust laws, see, *e. g., In re Professional Hockey Antitrust Litigation*, 63 F.R.D. 641, 642 (E.D.Pa.1974), *aff'd, sub nom. National Hockey League v. Metropolitan, supra*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).

The trial of this case began before a jury on January 12, 1981, almost five months ago, and has proceeded continuously on a four-days-a-week schedule thereafter. The trial will be concluded in only 7 days. If this Court were disposed to impose extreme sanctions of the type sought by defendants, it would not do so at this stage of the trial because of the risk that the lengthy ordeal would have to be repeated, for example, if the Court of Appeals should reverse this Court's findings and conclusions as to the misconduct of plaintiffs' counsel or should disagree as to the sanctions imposed. On the other hand, if the Court were disposed to impose any lesser sanctions, such as an award of costs or a multiple thereof, the trial would likewise go to completion.

Accordingly, I shall determine what sanctions to impose under Rule 37 after the jury has rendered its verdict.

SO ORDERED.

